Phillip Daniel TOMPKINS, Appellant,

v.

The STATE of Texas, Appellee.

No. 68870.

Court of Criminal Appeals of Texas,
En Banc.

Oct. 7, 1987.

**198**

Robert A. Jones, Larry D. Dowell, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and J. Sidney Crowley and Norma Davenport, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TEAGUE, Judge.

Phillip Daniel Tompkins, hereinafter appellant, was convicted by a jury of intentionally causing the death of Mary D. Berry while in the course of committing or attempting to commit the offenses of robbery and kidnapping of Berry, which elevated the offense of murder to capital murder. See V.T.C.A., Penal Code, Section 19.-

03(a)(2). After the jury answered in the affirmative the special issues that were submitted to it pursuant to Art. 37.071, V.A.C.C.P., the trial judge assessed appellant's punishment at death.

We affirm.

Appellant presents to this Court several "Issues for Review" in the two briefs that are in the record of appeal. For purposes of this appeal, we will refer to his "Issues for Review" as "Points of Error."[1] None of appellant's contentions challenge the sufficiency of the evidence on guilt or on any of the issues submitted on punishment. Appellant's points of error, which we group as follows, assert that he is entitled to a new trial because of the following: (1) the prosecuting attorneys selectively exercised their peremptory strikes on several black prospective jurors and fashioned their respective voir dire examination of the remaining black prospective jurors in such a manner so that all blacks would be prevented from serving as jurors in this cause; (2) the trial judge erred by not granting his motion to quash the indictment; (3) the trial judge erred in not finding that a State's witness was, as a matter of law, his common law wife; (4) the trial judge erred in not instructing the jury on the lesser included offenses of involuntary manslaughter and criminally negligent homicide; (5) the trial judge erred in permitting a prison psychologist from the Commonwealth of Virginia to testify against him at the punishment stage of the trial; (6) the trial judge erred in not excluding at the punishment stage of the trial the testimony of two reputation witnesses from the Commonwealth of Virginia who testified for the State; (7) statements made by one of the prosecuting attorneys during her jury argument at the punishment stage of the trial were so egregious that they deprived appellant of a fair and impartial trial; and (8) this Court erred in refusing to grant him permission to file his original appellate brief that numbered 144 pages, which at

---

1. Since the promulgation of the new Rules of Appellate Procedure, effective September 1, 1986, contentions in a death penalty case are now referred to as "points of error." See Tex.R. App.Proc. 74(d), 210(b). Previously, such were labeled "grounds of error." See Tex.R.App. Proc. 210(b); Art. 40.09(9), V.A.C.C.P.

the time it was submitted for filing exceeded the then existing maximum of 50 pages by 94 pages.

Finding that none of appellant's contentions merit this Court legally reversing his conviction, we will expressly overrule all of them and affirm the trial court's judgment of conviction and sentence of death.

Appellant first asserts that the trial judge erred in overruling his motion to quash the jury that had been selected in this cause because the State excluded by peremptory strikes five black venirepersons, thus depriving him of "his right to a trial by a jury of his peers which was truly representative of a cross-section of the community." Appellant relies upon the Constitutions of Texas, the United States, the Texas Code of Criminal Procedure, and case law from this Court and the Supreme Court of the United States as authority for his contention. The record reflects that appellant's motion to quash the jury was presented and overruled prior to the presentation of any evidence but after the jury had been selected to hear this cause.

■ At the time of appellant's trial, the law on the issue that appellant presents to this Court for review was governed by the Supreme Court decision of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13

L.Ed.2d 759 (1965). However, on April 30, 1986, while appellant's case was pending review by this Court, the Supreme Court of the United States in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), overruled *Swain*, supra, "[t]o the extent that anything in *Swain v. Alabama*, supra, is contrary to the principles we articulate today ..." 106 S.Ct. at 1725.[2] In *Griffith v. Kentucky* and *Brown v. United States*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the Supreme Court held that *Batson*, supra, applied to litigation pending on direct State or federal review or not yet final when *Batson*, supra, was decided on April 30, 1986, "with no exception for cases in which the new rule constitutes a 'clear break' with the past." However, the Supreme Court held in *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), that *Batson*, supra, was not to be applied retroactively to a case then pending on federal habeas review. Thus, the issue that appellant presents must be decided pursuant to *Batson*, supra, and not *Swain*, supra.

We believe that in order for the reader to fully appreciate what the Supreme Court stated and held in *Batson*, supra, it is necessary to briefly review what the Court stated and held in *Swain*, supra.

**2.** Although we, of course, cannot expressly state what motivated or caused the Supreme Court to reconsider the requirements it laid down in *Swain*, supra, in order for an accused person to establish a prima facie case, we observe that many articles criticizing that decision had been previously written. See footnote 14 in *Batson*, supra. Also see Ginger, *Jury Selection in Criminal Trials* (1980 edition); Comment, "The Prosecutor's Exercise of the Peremptory Challenge to Exclude Nonwhite Jurors: A Valued Common Law Privilege in Conflict with the Equal Protection Clause," 46 *U.Cin.L.Rev.* 554 (1977); Comment: "A Case Study of the Peremptory Challenge: A Subtle Strike at Equal Protection and Due Process," 18 *St. Louis U.L.Rev.* 622 (1974); Comment: "Swain v. Alabama: A Constitutional Blueprint for the Perpetuation of the All–White Jury," 52 *Va.L.Rev.* 1157 (1966); Comment: "Fair Jury Selection Procedures," 75 *Yale L.J.* 322 (1966); Note: "Limiting the Peremptory Challenge: Representation of Groups of Petit Juries," 86 *Yale L.J.* 175 (1976); Note: 79 *Harv. L.Rev.* 135 (1965); Note: "Affirmative Selection: A New Response to Peremptory Challenge Abuse," 38 *Stanford L.Rev.* 781 (1986); "State v.

Neil: The Peremptory Challenge Lives On, But For How Long?" 15 *Stetson Law Rev.* 515 (1986); the articles set out in 33 CrL 4068, footnote 1 (June 1, 1983), and the dissenting opinions filed by Justice Marshall, in which Justice Brennan joined, to the refusal of the Court to grant certiorari in *McCray v. New York; Miller v. Illinois; and Perry v. Louisiana* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983). Since *Batson*, supra, was decided it, too, has caused scholars to analyze and interpret it, and in at least one instance to vigorously assail that decision. See Erickson, Neighbors, and George, *United States Supreme Court Cases and Comments* (1986 edition). However, objective articles have also been written. See "Batson v. Kentucky: The Court's Response to the Problem of Discriminatory Use of Peremptory Challenges," 36 *Case Western Law Review* 581 (1986); Belcuore, "Restricting Racially Motivated Peremptory Challenges", 34 *Federal Bar News & Journal*, January, 1987; Meyer, "Wheeler a Decade Later: The Revolution Continues", *Forum*, March/April, 1987; Udasham, *"Batson v. Kentucky*: a Defense Perspective", Summer 1987, *Voice for the Defense.*

In *Swain v. Alabama,* supra, the Supreme Court reaffirmed the principle of law laid down in *Strauder v. West Virginia,* 10 Otto 303, 100 U.S. 303, 25 L.Ed. 664 (1880), and other cases, see those compiled in 106 S.Ct. at 1716, fn. 3, that a State may not purposefully exclude members of the black race from jury service solely because of their race. In *Strauder,* the State of West Virginia had passed a statute which permitted only white persons to serve as jurors, which the Supreme Court declared was unconstitutional. Although the Supreme Court reaffirmed in *Swain,* supra, the principle that a "State's purposefulness or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause," i.e., that prosecuting attorneys may not exclude members of the same race as the defendant from the jury venire on account of race or on the false assumption that members of the defendant's race as a group are not qualified to serve as jurors, it also held that "the defendant must, to pose the issue, show the prosecutor's systematic use of peremptory challenges against Negroes over a period of time ..." 85 S.Ct. at 839. The Court also held that there was a presumption that the prosecuting attorney did not exercise his peremptory strikes on account of race or on the false assumption that members of the defendant's race as a group are not qualified to serve as jurors.

Based upon what the Supreme court had stated and held in *Swain,* supra, courts throughout the nation, including this Court, see, for example, *Ridley v. State,* 475 S.W.2d 769 (Tex.Cr.App.1972), also see the list of cases cited on page 51 of appellant's original brief, held that merely because no member of the defendant's race had ever served as a juror in a criminal case which the prosecuting attorney had prosecuted was insufficient to establish a prima facie case of purposeful discrimination by that prosecuting attorney, i.e., in the instance where the defendant was black, to establish a prima facie case of purposeful discrimination by the prosecuting attorney, it was necessary for him to establish the repeated striking of blacks over a number of cases by the same prosecuting attorney before a prima facie case was established.

In *Batson,* supra, the Supreme Court, after concluding that the quantum of proof made necessary by *Swain,* supra, largely made prosecuting attorneys use of peremptory strikes immune from constitutional scrutiny, then set out a lesser burden of proof through which the defendant could establish a prima facie case of purposeful discrimination by the prosecuting attorney:

> To establish such a case, [that the prosecuting attorney had exercised his peremptory challenges on the basis of purposeful discrimination], the defendant first must show that he is a member of a cognizable racial group ..., and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race ... [T]hese facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors raises the necessary inference of purposefulness discrimination. 106 S.Ct. at 1723.

If a prima facie case is established by the defendant, the prosecuting attorney's exercise of his peremptories to strike black persons would violate principles of equal protection of the law, unless he could come forward and demonstrate some "neutral"-non-race related- explanation, relating to the case to be tried, for excluding the prospective jurors. *Batson,* supra, held that to be acceptable the explanation need not, however, be equal to "cause" sufficient to justify a challenge to a juror for cause.[3] Thus, under *Batson,* supra, it is only when the defendant makes a prima facie showing that the burden then, and only then, shifts to the State to come forward with a neutral explanation why peremptory strikes were exercised on the

---

**3.** *Batson,* supra, does not concern the State challenging prospective black venirepersons for cause.

black jurors who were struck. 106 S.Ct. at 1723.

As previously pointed out, while appellant's case was under submission and pending review by this Court, the Supreme Court decided *Batson v. Kentucky*, supra. In light of *Batson's* evident impact upon appellant's above contention, on April 22, 1987, this Court in an unpublished opinion ordered the appeal abated to the trial court with instructions to the trial judge to conduct an evidentiary hearing and determine whether appellant had made a prima facie showing of purposeful discrimination and, if so, whether the prosecuting attorneys in this cause could offer a racially neutral explanation for using their peremptory strikes which is what we also did in *Henry v. State*, 729 S.W.2d 732 (Tex.Cr.App.1987); *Keeton v. State*, 724 S.W.2d 58 (Tex.Cr. App.1987); and *Williams v. State*, 731 S.W.2d 563 (Tex.Cr.App.1987).[4] The trial court has conducted the hearing, and the appellate record is now supplemented with a statement of facts of the hearing and written findings of fact and conclusions of law from the trial judge, a copy of which is attached to this opinion as "Appendix A". The trial judge found that appellant established a prima facie case "under Batson", and also found, implicitly, that the prosecuting attorneys did not exercise their peremptories against the five black venirepersons complained about solely on account of their race or on the assumption that black jurors as a group would be unable impartially consider the State's case against appellant, who the record reflects is a member of the same race, and expressly found that the prosecuting attorneys gave neutral non-racial explanations for exercising peremptory strikes against the five black venirepersons, about which appellant complains.

Neither party challenges the trial court's finding that a prima facie case of purposeful discrimination was established by appellant, and we find that the record supports such a finding. Therefore, we have no occasion to consider whether appellant did, in fact, establish a prima facie showing of purposeful discrimination. Rather, we now turn to a review of the trial court's determination that the prosecuting attorneys did not use peremptory strikes for the purpose of excluding from jury service members of appellant's race.

The relative burdens of proof appropriate to the inquiry are given by *Batson*, supra, which we here excerpt and arrange in logical sequence:

Once a defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors ... related to the particular case to be tried. [106 S.Ct. at 1723].

. . . . .

If the trial court decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed. [106 S.Ct. at 1725].

. . . . .

[If the prosecutor does come forward with such an explanation] [t]he trial court then will have the duty to determine if the defendant has established purposeful discrimination. [106 S.Ct. at 1723–1724].

. . . . .

Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference. [106 S.Ct. at 1724, n. 21].

A prima facie case represents the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true. The party with the burden of proof must produce at least this much evidence to avoid a finding that the allegation is not true as a matter of law. Once produced, however, the allegation must be found true unless it is contradicted, impeached, or rebutted by other evidence. In the present context, such other

---

**4.** Also see *De Blanc v. State*, 732 S.W.2d 640 (Tex.Cr.App.1987).

evidence must include a racially neutral explanation by the prosecuting attorneys, and must be legally adequate to support a judgment in favor of the State. If it is, an issue of fact is joined which can only be resolved by an assessment of evidentiary weight and credibility. It is the burden of the accused to persuade the trial judge by a preponderance of the evidence that the allegations of purposeful discrimination are true in fact.[5]

■ Here, we are on much more familiar ground, for it is the sufficiency of evidence to support the proposition that we evaluate against a settled standard. Thus, where the accused has the ultimate burden to prove a factual allegation, such as purposeful discrimination in jury selection, by a preponderance of evidence, an appellate court must view the entire record in a manner favorable to the factfinder's determination and reverse only if no rational trier of fact could have failed to find his factual allegation true by a preponderance of evidence. See *Van Guilder v. State*, 709 S.W.2d 178 (Tex.Cr.App.1985), cert. denied, 476 U.S. 1169, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986); *Schuessler v. State*, 719 S.W.2d 320 (Tex.Cr.App.1986).

■ A trial judge, in determining whether a prospective juror has been challenged by the prosecution on a racial basis in violation of the United States Constitution, see *Batson*, supra, has an obligation to weigh the evidence and assess the credibility of witnesses.[6] In short, the trial judge is a factfinder. If from the evidence he believes that the prosecutor exercised peremptory strikes to exclude venirepersons based upon racial considerations, it is his duty to so find. This Court and the courts of appeals are principally reviewing courts. We do not substitute our judgments of witnesses' credibility and evidentiary weight for those of the factfinder, but affirm those judgments whenever the record discloses sufficient evidence in their support.

■ At the "Batson" hearing that this Court ordered, see *ante*, though certainly afforded the opportunity to do so, appellant did not attempt to compare the five complained about black venirepersons with any of those venirepersons who were not challenged by the prosecution.[6A]

---

**5.** Support for the foregoing parargaph may be found in the following note from *Batson,* supra, 106 S.Ct. at 1721, n. 18, and the cases cited therein:

"[D]ecisions in the context of Title VII [of the Civil Rights Act of 1964] 'disparate treatment' have explained the operation of prima facie burden of proof rules. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). The party alleging that he has been the victim of intentional discrimination carries the ultimate burden of persuasion. *Texas Department of Community Affairs v. Burdine,* supra, 450 U.S. at 252–256, 101 S.Ct. at 1093–95."

**6.** Obviously, the prosecutor's testimony cannot alone be dispositive of the question. If he admits a racially motivated reason for exclusion, without more, the trial judge should never find otherwise. But if he denies any racial motive, the trial judge as factfinder must necessarily gauge the credibility of his testimony, determined in part, at least, by the plausability of his explanation. This task is no different in principle than any other factfinding enterprise.

**6A.** In a supplemental brief, filed on September, 28, 1987, appellant has offered just such a comparison, inviting this Court to employ the record of jury selection that exists in this cause to impeach or rebut testimony given by the prosecutors at the *"Batson"* hearing, supra. The point is well-taken and does cast considerable doubt upon the neutral explanations offered by counsel for the State. Had the matter been pressed by defense counsel during his cross-examination of the prosecutors, or otherwise brought before the trial judge at the *"Batson"* hearing, it might have materially affected the trial judge's ultimate findings of fact.

However, even though the trial judge might have judicially noticed or independently recalled testimony from the jury selection process, there is nothing in the *"Batson"* hearing to suggest that she was requested by defense counsel to do so. In short, at the *"Batson"* hearing counsel for appellant gave no indication to the trial judge that he wanted her to consider the credibility of any neutral explanation offered by the State based upon the manner in which similarly-situated white veniremen were treated during *voir dire.*

We point out that, at a hearing conducted pursuant to *Batson,* the trial judge is the factfinder, and it is his responsibility to weigh the evidence and determine the credibility of the

**203**

Appellant, however, did establish that black jurors have been relatively uncommon on capital murder juries in Harris County during the past several years, but did not elicit any evidence that the Office of the District Attorney of Harris County, which appears contrary to the policy that the Office of the District Attorney of Dallas County once had, see *Batson v. Kentucky*, supra, Marshall, J., concurring opinion, 90 L.Ed.2d at 92, to exclude, through peremptory strikes, "Jews, Negroes, Dagos, Mexicans or a member of any minority race" from serving on a jury.

As to the five black prospective venirepersons who were peremptorily struck by the prosecuting attorneys, we agree with the trial judge that the prosecuting attorneys articulated at the hearing racially neutral explanations, which were both plausible and unambiguous, for exercising their peremptories on the five complained about black venirepersons.

■ The prosecuting attorneys' testimony reflects that two of the five black venirepersons were struck because of their general opposition to the death penalty, although such beliefs would not have prevented or substantially impaired them from performing the office of juror. One of the two venirepersons also indicated that she might refuse to return a verdict unless appellant testified at trial. Thus, as to two of the five, there was an independent, non-racial basis for the prosecuting attorneys' decision to strike these two black venirepersons.

■ The prosecuting attorneys' testimony reflects that a third black venireperson, who in the course of her employment had been twice robbed at gunpoint, was excluded, by the prosecuting attorney's statement at the "Batson hearing", because she indicated serious reservations about returning a verdict of guilty based on circumstantial evidence alone.

Contrary to the complete memory of the attorneys for the respective parties who participated in the trial and at the "Batson hearing", and apparently the trial judge herself, the record reflects that the trial judge ruled, after the pretrial hearing on appellant's motion to suppress appellant's confession had been held, as follows: "Your motion is denied as to the written confession. It is sustained as to the oral confession, to wit, the tape recordings that we heard the testimony in that regard." See Vol. VI of XXIV, page 67, of the record. The record also reflects that thereafter, during the trial, the trial judge, after a Justice of the Peace from Travis County, Hon. Guy Herman, who had testified at the pretrial hearing on appellant's motion to suppress, had testified in part, *sua sponte* excused the jury and then stated the following: "All right. Gentlemen, in view of Judge Herman's testimony and in view of the Supreme Court's decision in Edwards versus Arizona returned on May 18, 1981, *which is approximately a month after we had a Jackson-Denno hearing in this case,* I will reverse my prior ruling regarding your Jackson-Denno hearing and the Motion to Suppress the written confession of the defendant is granted." (Our emphasis.) See Vol. XXII of XXIX, stamped pages 767–768, printed pages 56–57, of the record.

Thus, when the prosecuting attorney conducted his voir dire examination of the above venireperson, he had appellant's written confession, which had been ruled by the trial judge to be admissible evidence, ready to be offered into evidence. This was certainly direct evidence, although it might be arguable as to how direct it was to all that needed to be proved in order to establish beyond a reasonable doubt appellant's guilt of capital murder. Nevertheless, we find his statement that he gave at the "Batson hearing", in response

witnesses. A reviewing court should reverse his findings only when they are not supported by sufficient evidence or, as we often say, for an "abuse of discretion." Because the trial judge was not urged to make, and did not make, a finding based upon a comparison analysis in deciding the issue whether the prosecutors' neu-

tral explanations were rebutted or impeached at the *"Batson"* hearing with evidence that unchallenged white veniremen also possessed the same purportedly undesireable characteristics, we do not consider this circumstance in reviewing the trial judge's findings in this cause.

to the question, "Q: Why was the law of circumstantial evidence so important at that particular time?", "A: That was my whole case. We had no direct evidence ...", a little shocking and totally not understandable. Without more, we find that we would have to hold that only an irrational trier of fact could have accepted this reason as a "neutral explanation" why he used a peremptory strike on the juror.

There is more however. The voir dire examination of the above venireperson reflects that she was first questioned by the trial judge. One of the prosecuting attorneys, who testified at the "Batson hearing", then questioned the venireperson. He first covered with her such legal terms as "burden of proof" and "reasonable doubt", and then explained to her the elements of the offense of capital murder and murder, and the difference in punishment for capital murder and murder. The venireperson stated that if she found a defendant guilty of murder she could consider the entire range of punishment for that offense. He then explained to her the elements of the alleged underlying felony offenses and intent. He then covered with her the law of parties and motive. During the questioning, the venireperson stated that "All I want to know if he was there at the time or if he actually did it." The prosecutor then covered the legal term "presumption of innocence" and the right of the accused not to testify. He then covered the punishment stage where the defendant has been found guilty of capital murder, and the special issues that the jury would answer. The prosecutor also asked the venireperson what the term "deliberately" meant to her, and ascertained that she would not automatically answer the special issues in the affirmative simply because she had found the defendant guilty of capital murder, and would answer them based upon the evidence presented. The prosecuting attorney then questioned the venireperson about her understanding of direct versus circumstantial evidence. When asked, whether "in the proper case can you apply the law of circumstantial evidence in a capital murder case?", "Can you find someone guilty of capital murder based on what we call—you know, we have got to put a label on everything—not direct evidence, but circumstantial evidence?", the venireperson responded: "I don't think so." The trial judge then questioned the venireperson, using the example "Nobody saw him get into the cookie jar" to describe the meaning of the legal term "circumstantial evidence". Finally, the venireperson stated that she could not apply the law of circumstantial evidence to a capital murder case. However, she also stated that she could find someone guilty based on circumstantial evidence, "if I was shown all of the possibilities of beyond a reasonable doubt. I could." Thereafter, the prosecuting attorney questioned the venireperson concerning believing a police officer over a lay person, her employment and whether jury service would cast an undue burden on her. The defense did not question the venireperson about circumstantial evidence, or direct evidence for that matter. The prosecutor thereafter used a peremptory strike on the venireperson.

Although when the prosecutor voir dired the venireperson, because he then had appellant's written confession which had been ruled admissible evidence, his case was not entirely dependent upon circumstantial evidence, if at all. As things turned out, his case ultimately turned on circumstantial evidence. In fact, the trial judge instructed the jury on the law of circumstantial evidence.

Therefore, because appellant's written confession, which we attach to this opinion as "Appendix B", did not completely rule out an instruction by the trial judge on the law of circumstantial evidence, we hold that the prosecuting attorney exercised a peremptory on the venireperson rather than risk a hung jury.

■ The prosecuting attorney exercised a peremptory strike on the fourth black venireperson because, according to the prosecuting attorney who testified on this point, that person's reading and writing skills were poor. Since the case was complex and was expected to include detailed written jury instructions, the State evidently preferred to avoid literacy problems,

which are race neutral, and used a peremptory strike on that person.

█ The fifth black venireperson gives us great concern because the testimony reflects that that person was peremptorily struck solely, by the testimony of the prosecuting attorney who testified on this point, because he had been an employee of the United States Postal Service for some thirteen years, and not "simply because he was black."

The record reflects that that venireperson expressed a certain difficulty understanding the law of causation in criminal cases, as well as the notions of "probability" and "continuing threat to society" concerning the punishment issues, which understanding we find was essential in order for the juror to decide whether appellant was guilty of capital murder and, if so, whether there was a probability that appellant would thereafter commit criminal acts of violence that would constitute a continuing threat to society. However, our reading of the entire jury selection process in this case discloses widespread disagreement and uncertainty among the venirepersons, as it does in nearly every capital murder case, regarding legal definitions and concepts, which are usually alien to most venirepersons. Not surprisingly, it is not uncommon for those venirepersons to appear inarticulate, confused, and tentative under these conditions. We find that this prospective black venireperson's answers to questions asked did not indicate an inability on his part, that was any greater or less than the unchallenged venirepersons, to understand the law or to apply it impartially. This venireperson also did not indicate a bias or prejudice against any phase of the law pertinent to this case. Indeed, the State did not urge at the hearing any such basis upon which to doubt the venireperson's qualifications for jury service. As noted, the sole reason given why the venireperson was struck was that he was an employee of the United States Postal Service.

We have some difficulty understanding the relevancy of a venireperson's employment as a postman employed by the United States Government as far as his qualifications for jury service. Although the prosecuting attorney indicated that "I have not had very good luck with postal employees", she did not elaborate upon her evident bias against such employees. Perhaps, indeed, federal postal employees share a common view of the criminal justice system antithetical to the interests of law enforcement. But if so, we are not aware of it, nor has the State undertaken to enlighten us further on the subject.

Notwithstanding what we have stated, we find that the prosecuting attorney's reasons that she gave constitute a racially neutral explanation, and it is not the office of this Court to judge her credibility. Explicit in *Batson*, supra, is that a prosecuting attorney is free to exercise his peremptory strikes, provided that they are non-race related. "The challenge, after all, is still a peremptory one." See Belcuore, supra.

Therefore, we conclude, with respect to the five complained about black venirepersons, that a rational trier of fact might have failed to find, by a preponderance of the evidence, an intentional discrimination on the part of the prosecuting attorneys in this cause. By so holding, we remind trial judges who are confronted with the issue that in their capacities as factfinders the truth of a racially neutral explanation should be judged in part by its plausibility. A trial judge may not abdicate his responsibility to decide whether a peremptory challenge was racially motivated, nor may he leave such questions to an appellate resolution. He is the factfinder in such matters, and must find the facts fairly and judiciously, according to the burdens of proof prescribed by law.

We have carefully scrutinized the prosecuting attorneys' offered reasons why they used five of their peremptory strikes on the above five black venirepersons in light of the hearing that was conducted by the trial judge and find and conclude that the trial judge believed the race-neutral explanations given by them. Whether this Court would have made the same judgment as the trial judge did is unimportant, because

her conclusion, given a subjective belief in the truth of the prosecuting attorneys' explanations, which is supported by sufficient evidence, comports with that of a rational trier of fact.

Appellant's first contention is overruled. Also see *People v. Turner*, 42 Cal.3d 711, 230 Cal.Rptr. 656, 726 P.2d 102 (1986); *Branch v. State*, 526 So.2d 605 (Ala.Crim. App.1986) Patterson, J.; *United States v. Woods*, 812 F.2d 1483 (4th Cir.1987); *State v. Butler*, 731 S.W.2d 265 (Mo.Ct.App.—W. Dist.1987); *State v. Jones*, 358 S.E.2d 701 (S.C.1987). Also see footnote 2, *ante*.

█ Appellant next contends that his conviction should be reversed because "The trial court erred in overruling his motion to quash the indictment for the reason that it fails to set forth clearly and unequivocally the offense for which he was charged in plain and intelligible words insomuch that Appellant was precluded from knowing the exact nature of the offense for which he was charged." We disagree.

The indictment in this cause, in unnumbered count one, charged that appellant, "while in the course of committing and attempting to commit the Robbery of MARY D. BERRY, hereafter styled the Complainant, intentionally cause[d] the death of the Complainant by suffocating the Complainant by placing a cloth gag in her mouth", and, in unnumbered count two, charged that appellant, "while in the course of committing and attempting to commit the Kidnapping of MARY D. BERRY, hereafter styled the Complainant, intentionally cause[d] the death of the Complainant by suffocating the Complainant by placing a cloth gag in her mouth." Both counts were submitted to the jury. The jury's verdict simply reads: "WE, THE JURY, FIND THE DEFENDANT, PHILLIP DANIEL TOMPKINS, GUILTY OF CAPITAL MURDER." Sec. Att. 37.07, Sec. 1(a), V.A.C.C.P.

We understand appellant's argument to be that the indictment was subject to his motion to quash because it failed to give him notice of the constituent elements of the offenses of robbery, kidnapping, attempted kidnapping, and attempted rob-

bery, which were the underlying offenses alleged in this cause to elevate the offense of murder to capital murder. See V.T.C.A., Penal Code, Section 19.03. We find no authority supporting appellant's contention. The capital murder statute, Section 19.03, supra, did not require the pleader to define with particularity in the indictment the constituent elements of the underlying felony offenses that were alleged in the indictment in this cause.

Just recently, in *Landry v. State*, 706 S.W.2d 105 (Tex.Cr.App.1985), this Court rejected a like contention, simply stating the following: "[T]his Court has in the past upheld capital murder indictments identical to the instant indictment in the face of a motion to quash. See *Hammett v. State*, 578 S.W.2d 699 (Tex.Cr.App.1979), *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977); *Smith v. State*, 540 S.W.2d 693 (Tex.Cr. App.1976), and *Demouchette v. State*, 591 S.W.2d 488 (Tex.Cr.App.1979). These cases all stand for the proposition that it is unnecessary to allege the elements of the underlying felony in a capital murder indictment ..." (107–108).

*Hammett*, supra, cited *Smith*, supra, *Burns*, supra, *Gonzalez v. State*, 517 S.W.2d 785 (Tex.Cr.App.1975), *Watts v. State*, 516 S.W.2d 414 (Tex.Cr.App.1974), and *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App.1976), as its authority, all of which made a like conclusory holding. *Smith*, supra, merely held: "Appellant's contention [that the indictment was fatally defective because it failed to set out the elements of robbery where the charge was murder committed in the course of committing a robbery] was answered adversely to him in *Jones v. State*, 53 Tex.Cr.R. 131, 110 S.W. 741 [1908], and *Oates v. State*, 48 Tex.Cr.R. 131, 86 S.W. 769 [1905], which hold that an indictment need not allege the constituent elements of a felony which the defendant was committing or attempting to commit at the time of the homicide charged in the indictment.", i.e., an indictment charging one offense during the commission of another crime need not allege the elements of the latter offense. Also see *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.

App.1980); *White v. State*, 543 S.W.2d 104 (Tex.Cr.App.1976); *Earl v. State*, 514 S.W.2d 273 (Tex.Cr.App.1974). Appellant's contention is overruled.

In overruling appellant's contention, we are not unmindful of what this Court stated and held in *King v. State*, 594 S.W.2d 425 (Tex.Cr.App.1980). There, this Court held that a capital murder indictment, which did not allege who the victim of the underlying offense was, contrary to here, was subject to the defendant's motion to quash. This Court held: "It is clear that *when criminal conduct,* constituting an aggravated feature of an offense *may be directed at a person other than the ultimate victim of the crime alleged,* the specification of that person is a fact to which the accused is entitled should he request it by timely filed written motion to quash. (Citations omitted.)" (426) (Our emphasis.) In reaching this holding, this Court distinguished several of the above mentioned cases where relief had not been granted and pointed out that "the name of the person at whom the aggravating conduct is directed is not an essential element in such a context, but rather, a fact which is crucial to the accused's preparation of his defense to the main charge of capital murder," (426–427), i.e., when criminal conduct constituting an aggravating feature of an offense may be directed at a person other than the ultimate victim of the crime alleged, the specification of that person is a fact to which the accused is entitled should he request it by timely filed written motion to quash. The requirements of *King,* supra, were satisfied in this cause because the indictment here alleged that Berry was both the victim of th murder and the victim of the robbery and kidnapping. E.g., *Pinkerton v. State*, 660 S.W.2d 58, 63 (Tex.Cr. App.1983). Cf. *Beck v. State*, 682 S.W.2d 550 (Tex.Cr.App.1985).

We find and hold that the indictment in this cause did not fail to convey some requisite item of notice to appellant. Cf. *Adams v. State*, 707 S.W.2d 900 (Tex.Cr. App.1986), in which a majority of this Court expressly overruled this Court's decision of *Jeffers v. State*, 646 S.W.2d 185 (Tex.Cr.App.1983), which had expressly overruled *Craven v. State*, 613 S.W.2d 488 (Tex.Cr.App.1981). Also see *Drumm v. State*, 560 S.W.2d 944 (Tex.Cr.App.1977).

Appellant's contention that the trial judge should have sustained his motion to quash the indictment, for the reasons he gave, is overruled.

■ Appellant next asserts that his conviction should be reversed because "The trial court erred in permitting the prosecution to call during the guilt/innocence phase of trial the Appellant's wife as a witness for the State in the presence of the jury." As authority, appellant relies upon, inter alia, the provisions of Art. 38.11, V.A. C.C.P., the "husband-wife privilege" statute that prohibits either spouse, except in certain enumerated instances not applicable here, from testifying against the other spouse. For an up-to-date discussion of the privilege, which may no longer exist because of Rule 504, Tex.Rules of Crim. Evid., effective September 1, 1986, see *Willard v. State*, 719 S.W.2d 595 (Tex.Cr.App. 1986). Because appellant's trial occurred prior to September 1, 1986, the provisions of Art. 38.11, supra, are applicable to this cause.

On the issue of whether or not a common law marriage existed, the trial judge in this cause first instructed the jury in the abstract on the elements of a common law marriage: "1. An agreement to become husband and wife; 2. Cohabitation pursuant to that agreement; and (3) A holding out of each other to the public as husband and wife pursuant to the agreement," and then instructed the jury that "if it [found] by a preponderance of the evidence that a common-law marriage exist[ed] between Phillip Daniel Tompkins [appellant] and Lisa Miles, then [it would] not consider the testimony of Lisa Miles for any purpose and [would] wholly disregard [her testimony]." The jury was not asked to make, nor did it make, a specific finding on the issue.

The record reflects that the trial judge conducted a hearing out of the jury's presence on the appellant's motion to prohibit Miles from testifying for the State and against him, after which she, the trial

judge, overruled the motion and permitted Miles to testify for the State.

Although the record reflects that Miles was originally arrested with appellant for committing the capital murder of the deceased, the record does not reflect or indicate that she was ever formally charged with committing or participating in the commission of the murder of the deceased. The record does reflect that after she was arrested she was released, but does not reflect the circumstances that governed her release. We have yet to find in the record a request by appellant that the jury could find that Miles, either as a matter of fact or law, was an accomplice witness. However, our review of the record reflects that such a request would have been without merit.

The record of the hearing held outside the presence of the jury to determine whether Miles and appellant were common law husband and wife reflects the following: Miles testified that she had known appellant "Since about August or September of 1980", commenced living with him on December 1, 1980, and continued to live with him until they were both arrested in Austin on January 26, 1981. Miles testified that although she and appellant were not married "in the eyes of the law," because a ceremonial marriage had not yet been performed, she nevertheless considered herself then married to appellant. She further testified that she and appellant intended in the future to go through a ceremonial marriage. Miles admitted in her testimony that she never told anyone, including her mother, that she and appellant were married, because "the question never came up"; admitted that she never filed with any County Clerk a declaration of informal marriage, see Section 1.92, *Family Code;* and admitted that she never went "by the name of Lisa Tompkins." The testimony also established that when appellant and Miles decided to live together they rented an apartment together but signed their respective names to the apartment lease. There is also testimony that Miles had a young child; however, the record does not reflect any specifics regarding the child, such as who the natural father of the child

might have been and what relationship, if any, Miles and that person might have had. The subject of Miles' prior marital history, if any, was not broached by the parties.

The issue before us is not whether there was sufficient evidence before the jury to warrant the trial judge submitting the issue, whether as a matter of fact there was a common law marriage between appellant and Miles, to the jury because, by her instruction to the jury, the trial judge found that there was sufficient evidence to raise the issue of a common law marriage and so instructed the jury for it to resolve. The issue that we must resolve is whether appellant established as a matter of law at the hearing held outside of the jury's presence that he and Miles were married common law. In *Bodde v. State,* 568 S.W.2d 344, 352 (Tex.Cr.App.1978), this Court pointed out the following: "Although the better view is that such issues should be decided by the trial judge... prior decisions of this Court dictate that this issue, when raised by the evidence, be submitted to the jury..." This Court has long held that it will closely scrutinize a claim of common law marriage, and requires that the agreement to become husband and wife should be established by a preponderance of the evidence showing that the agreement was to be specific on both sides. See *Hightower v. State,* 629 S.W.2d 920 (Tex. Cr.App.1981); *Bodde v. State,* supra; *Chatman v. State,* 513 S.W.2d 854 (Tex.Cr. App.1974); *Welch v. State,* 151 Tex.Cr.R. 356, 207 S.W.2d 627 (Tex.Cr.App.1948). In *Welch,* supra, this Court emphasized the following: "Marriage is more than a contract, it is a status in which stability and permanence are vital, and this is particularly true when dealing with common-law marriages."

The elements of a common law marriage, as the jury was instructed in this cause, are the following: (1) that the parties enter into an agreement, express or implied, to become husband and wife; (2) that they thereafter cohabit pursuant to that agreement; and (3) a holding-out of each other to the general public that they are husband and wife. However, in order

to establish a common law marriage as a matter of law, it is not necessary to establish each element by direct proof, as each element may be established by circumstantial, as well as direct, evidence. Marriage, whether ceremonial or common-law, although the character of the evidence might be different, is proved as any other fact might be proved. See, for example, *Claveria's Estate v. Claveria*, 615 S.W.2d 164 (Tex.1981).

█ The provisions of Art. 38.11, supra, which prohibit husband or wife from testifying against each other, except in certain enumerated instances not applicable here, were not enacted to protect those persons "who are not legally married, nor parties who are unmarried, but who live together and recognize each other as husband and wife." *Johnson v. State*, 122 Tex.Cr.R. 224, 54 S.W.2d 140, 141 (1932). Merely living together with a person of the opposite sex and having intimate relations with that person do not establish, without more, the relationship of husband and wife. See *Johnson v. State*, supra, at 141. Whether a common law marriage has been established as a matter of law, as appellant asserts occurred here, must be decided on an *ad hoc* basis.

█ We reaffirm the rule of law that testimony of a witness that merely constitutes a conclusion that a common law marriage exists is not sufficient, standing alone, to establish a common law marriage. See, for example, *Bush v. State*, 261 S.W.2d 158, 160 (Tex.Cr.App. 1953).

█ It is undisputed in this cause that Miles and appellant lived together and cohabited for approximately two months. The fact that they might have intended to go through a ceremonial marriage at sometime in the future does not necessarily negate the inference that they believed that they were married common law. *Hernandez Aguilar v. State*, 715 S.W.2d 645, 648 (Tex.Cr.App.1986). We find that appellant has sustained his burden as to two of the above three elements that would establish a common law marriage. The question then becomes, did he establish the third element, a holding-out by himself and Miles

to the general public that they were husband and wife? We answer this question in the negative. We find and hold that the undisputed evidence establishes at most only an illicit relationship between Miles and appellant.

Although our courts, including this one, have either expressly or implicitly held that an agreement to become husband and wife might occur in private, our research to date reveals that all courts have always required that before a common law marriage might be found to exist as a matter of law there must be evidence, inter alia, that the parties held themselves out to the general public as husband and wife. See Speer's *Texas Family Law*, Chapter 2 (1975 edition).

From the evidence that was adduced at the hearing that was held outside the presence of the jury, we find that at most all that appellant established was that he and Miles might have had "a secret common law marriage," which does not constitute in Texas a common law marriage. See *Ex parte Threet*, 333 S.W.2d 361 (Tex.1960). Except for a "Harris County Pretrial Services Agency" form that is in the record, which was completed after appellant was placed in the Harris County Jail, and which pertains to possible pretrial release on bail without surety, and which was not introduced or offered into evidence at the hearing held outside the jury's presence, there is not a scintilla of corroborative evidence that might reflect or indicate that Miles and appellant held themselves out to the general public as husband and wife. This form does not appear to have been completed by appellant, but appears to have been completed by a third person based upon information that appellant gave that person. It is undisputed that at all times Miles maintained her last name and never used appellant's last name. When Miles and appellant rented an apartment, she did not use appellant's last name. Miles herself testified that she never told anyone, including her mother, that she and appellant were married. Thus, there is absolutely no non-hearsay independent testimony or evidence that Miles and appellant ever held

themselves out to the general public that they were husband and wife.

Appellant's contention that he established as a matter of law at the hearing conducted outside the jury's presence, or that he established during the jury's presence, that he and Miles were married common law is overruled.

Appellant next complains of the trial judge's refusal to instruct the jury on the lesser offenses of involuntary manslaughter and criminally negligent homicide at the guilt stage of the trial. After having carefully read the record, and the definitions of what constitutes criminally negligent homicide and involuntary manslaughter, we are unable to agree with appellant that the evidence adduced called for instructions on either of these lesser offenses.

In determining whether a defendant is entitled to a charge on a lesser included offense, this Court considers all the evidence presented. See, for example, *Cordova v. State*, 698 S.W.2d 107, 113 (Tex.Cr. App.1985). Also see *Lugo v. State*, 667 S.W.2d 144 (Tex.Cr.App.1984). If evidence from any source raises the issue of a lesser included offense an instruction on that offense must be included in the court's charge to the jury. See, for example, *Bell v. State*, 693 S.W.2d 434 (Tex.Cr.App.1985).

In determining whether a lesser included offense instruction must be given, a majority of this Court has long subscribed to a two-step analysis, which was first enunciated in the panel opinion of *Royster v. State*, 622 S.W.2d 442 (Tex.Cr. App.1981), and later adopted by a majority of the En Banc Court in *Aguilar v. State*, 682 S.W.2d 556 (Tex.Cr.App.1985). Also see *Thomas v. State*, 701 S.W.2d 653, 656 (Tex.Cr.App.1985). The two-step analysis requires *first*, that the lesser included offense is included within the proof necessary to establish the offense charged and, *second*, there must be some evidence in the record that if the defendant is guilty he is guilty only of the lesser offense. This "guilty only" rule of law has been interpreted by this Court to mean that if the evidence only raises the issue that the accused is guilty of the greater offense, or not guilty at all, an instruction on a lesser included offense need not be given. On the other hand, if the evidence raises the issue that, if guilty, the defendant is only guilty of the lesser offense, the instruction should be given.

The record reflects that appellant did not testify at the guilt stage of the trial, nor did he offer any evidence or testimony which might reasonably have raised the inference that if guilty, he was guilty only of criminally negligent homicide or involuntary manslaughter. The fact that the State, in proving the offense of capital murder, also proved the lesser offense of criminally negligent homicide or involuntary manslaughter does not, standing alone, entitle appellant to a charge on the lesser included offenses of criminally negligent homicide or involuntary manslaughter. See, for example, *Cordova*, supra.

The evidence reflects that appellant's twenty-four year old female victim, who was employed at Hermann Hospital in Houston as a pharmacist, left work at approximately 11:15 o'clock p.m. on Sunday, January 25, 1981. Approximately one hour later, her automobile was found abandoned, with its engine running, its lights on, and its doors closed, but not ·locked. Evidence was also presented from which one might infer that her wrong doer caused her to stop her car and thereafter kidnapped or abducted her. The victim's gagged and bound body was found during the morning hours of January 27, 1981 tied to a tree, which was located near the residence of the person who ultimately discovered her body. The record reflects that this person first only saw an object that had a bedsheet draped over it, which later fell to the ground, thus later enabling this person to identify the object as the body of a human being, which later was identified as the deceased. The victim's hands were tied tightly behind her back and a piece of shirt was tied around her neck and connected to her hands. The victim's feet were tied together with a bed sheet and an electrical cord. The entire system of knots and materials was very tight and the body appeared to have been previously under a lot

of tension. However, the evidence also reflects that there was enough slack that would have allowed some movement of the victim's knees and shoulders. There was also evidence that the tree the body was leaning against showed "scuff marks up and down", from which, with the bruises and abrasions found on the body, one might infer that the victim had attempted to escape. A gag of bed sheet material was, as was the victim's tongue, stuffed deep into the posterior pharynx, which is the rearmost portion of the mouth. There was also a gag wrapped tightly around the body's mouth. Dr. Joseph A. Jachimczyk, the world renowned Chief Medical Examiner for Harris County, performed an autopsy on the body of the deceased after which he concluded that the cause of death was suffocation due to gagging from the cloth gag found inside of the body's mouth. Jachimczyk also testified that if there was "no air coming in", it would take between 3 to 5 minutes after the gagging took place before Berry suffocated to death. Jachimczyk further testified that gagging is "as sure as sure a way" to cause someone's death, and that "if the degree of gagging is adequate, a person is just as dead from that as they are from a gunshot wound." The exact time of death could not be determined.

The evidence also established that between the time when Berry, the victim, disappeared until her body was found, appellant had used her bank teller card to obtain $1,000. There was also evidence that on the evening when Berry was last seen alive appellant was financially embarrassed, but soon thereafter appeared to have much money. There is no evidence in the record that might reflect or indicate that appellant had ever met or even seen his victim before the evening in question.

Although appellant gave a written confession to committing the crime, see "Appendix B", the trial judge, pursuant to appellant's motion to suppress, after first ruling that the confession was admissible evidence, later ruled that the confession could

not be used against appellant. In his confession, appellant stated that he had tied and gagged his victim solely to keep her from escaping and seeking help while he went and used the victim's bank card to obtain money. The confession reflects that when appellant returned to where the victim had been gagged and tied to the tree he saw that she was then dead, thus causing him to panic and ultimately flee to Austin where he was arrested on January 28, 1981.[7]

▆ Appellant contends that he was entitled to an instruction on the lesser offense of criminally negligent homicide because the evidence clearly supports the finding that he caused Berry's death negligently, rather than intentionally. Given the above, and the penal code definition of criminally negligent homicide, we disagree.

▆ Criminally negligent homicide may be a lesser included offense of involuntary manslaughter, which may be a lesser included offense of murder, which may be a lesser included offense of capital murder. See, for example, *Lugo v. State*, 667 S.W.2d 144, 147 (Tex.Cr.App.1984).

V.T.C.A., Penal Code, Section 6.03(d), defines "Criminal Negligence" as follows: "A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct *when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.*" (Our emphasis.)

Recently, in *Mendietta v. State*, 706 S.W.2d 651, 653 (Tex.Cr.App. 1986), a majority of this Court ruled that "It is incumbent that the record contain evidence showing *an unawareness of the risk* before a charge on criminally negligent homicide is required."

---

7. It appears that had appellant's written confession been admitted into evidence, the issues that

appellant presents might call for a conclusion different from the one we reach.

We cannot conclude from the evidence that was presented that one might infer therefrom that when appellant gagged, tied his victim's hands tightly behind her back, tied a piece of shirt around her neck, which was connected to her hands, tied her feet together with a bed sheet and an electrical cord, with the entire system of knots and materials used to tie her to a tree tied very tight, that he was then unaware of the risk his conduct created. Just because it might be speculated that appellant did not intend the result, given the admissible evidence, such does not change his awareness or perception of the risk his conduct created. We find and hold that the issue of criminally negligent homicide was not raised by the evidence. The trial court did not err in refusing to give the jury an instruction on that offense. Also see *Still v. State,* 709 S.W.2d 658 (Tex.Cr.App.1986); *Thomas v. State,* 699 S.W.2d 845 (Tex.Cr.App.1985); *Hunter v. State,* 647 S.W.2d 657 (Tex.Cr. App.1983); *Lewis v. State,* 529 S.W.2d 550 (Tex.Cr.App.1975).

Much of what we have stated above is also applicable to appellant's claim that the trial judge erred in not instructing the jury on the lesser offense of involuntary manslaughter.

 One of the ways that the offense of involuntary manslaughter might be committed is if the defendant *recklessly* causes the death of another individual. See V.T.C.A., Penal Code, Section 19.-05(a)(1). The culpable mental state of recklessly is defined as follows in V.T.C.A., Penal Code, Section 6.03(c): *"A person acts recklessly, or is reckless,* with respect to circumstances surrounding his conduct or the result of his conduct *when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.* The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's viewpoint." (Our emphasis.) As previously pointed out, appellant did not testify or offer any evidence that he caused his victim's death by a reckless act. Without evidence that appellant acted recklessly in causing the death of his victim we cannot state that the issue of involuntary manslaughter was raised by the evidence that was presented at the guilt stage of the trial. Cf. *Lugo v. State,* supra. Contrary to criminal negligence, which arises when a person ought to be aware of a substantial risk that the circumstances exist or the result will occur, involuntary manslaughter arises when a person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. We are unable to infer from the evidence that was presented that the issue whether appellant was aware of a substantial risk when he gagged and bound his victim to a tree and that might have caused her death was raised. The evidence reflects appellant left enough slack that would have allowed some movement of his victim's knees and shoulders. Thus, this act itself reflects that he was not "reckless" as the term is defined. Also see *Gordon v. State,* 640 S.W.2d 743 (Tex.App. —4th 1982), no P.D.R.

Appellant also argues under his contention regarding his claim that the trial judge erred in not instructing the jury on the lesser offenses of criminally negligent homicide and involuntary manslaughter that the Supreme Court decision of *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), also see *Keeble v. United States,* 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973), mandates such instructions be given. We disagree. There, the Supreme Court held that where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction of the alleged offense, thus requiring that the jury be given the option of convicting the defendant of some lesser included offense. Although we do not disagree with what the Supreme Court stated in the above cases, we find that *Beck,* supra, is factually distinguishable from the instant case. In *Beck,* supra, the defendant testified at trial and denied that he killed his victim or intended his victim's death, whereas here appellant

did not testify or present any evidence from any source that he possessed only the intent to either rob or kidnap Berry. E.g. *Santana v. State,* 714 S.W.2d 1, 9 (Tex.Cr. App.1986).

Appellant's contentions that the trial judge erred in refusing to instruct the jury on the lesser offenses of criminally negligent homicide and involuntary manslaughter are overruled.

Appellant next contends that "The trial court erred in overruling his objection to the prosecution having placed on the stand and eliciting testimony from [Jean Matthews, a Virginia] penal psychologist, who had consulted with Appellant in 1979 [, when he was incarcerated in the Virginia penitentiary,] for the reason that neither Appellant nor his counsel were notified in advance that the psychologist's testimony would encompass the Appellant's future dangerousness."

To fully understand and appreciate appellant's complaint, which at first blush appears frivolous, but which we find is not, we believe that it is necessary to give a little background information on appellant that pertained to when he was incarcerated, that relates to other than Matthews' testimony.

The record reflects that at the punishment stage of the trial the State established that in 1977 appellant was received by the Virginia Department of Corrections, Commonwealth of Virginia, after he had been convicted in a trial court of Virginia for committing the offenses of "Statutory Burglary" and "Grand Larceny." Evidence was also presented that when appellant was incarcerated in the penitentiary he became a "straw boss", who was an inmate given orders by employed personnel to keep other inmates in line and to relay to them what the employed personnel desired to be done or accomplished on behalf of the penal institution. Appellant was a "straw boss" for Herbert E. Norman, who was then Assistant Director of Recreation and a crew foreperson for the Department of Corrections. Appellant had the job of "straw boss" for approximately two years, which encompassed most of the time he

was incarcerated in the Virginia penitentiary. Norman testified that the reason that appellant was given the job of "straw boss" was because "nobody gave Mr. Tompkins a hassle. He had a way to handle himself pretty good and he had a way with himself, and he could get across what I had to get across." Appellant also assisted Norman in refereeing football and softball games that occurred between inmates. There was testimony that appellant, like many other inmates, would occasionally get into fights with other inmates.

The record also reflects that appellant was released from the penitentiary on February 28, 1980, when he was placed on parole. He remained on parole until July 9, 1980, when the parole officer's file on him was closed because he was "an absconder." A warrant for his arrest issued, however. The warrant was executed in our capital city, Austin, the day of appellant's arrest in this cause. See *ante.*

The record also reflects that while incarcerated in the Virginia penitentiary, appellant came into contact with Jean Matthews, a Ph.D. who was a "clinical-correctional psychologist" and head of the Psychology Services at Saint Brides Correctional Center in Chesapeake, Virginia. Although Matthews' credentials qualified her as an expert in the field of psychology, there is no testimony or evidence in the record that she has ever been licensed or certified by the Commonwealth of Virginia or any other State of the Union as a "clinical-correctional psychologist". The record, however, reflects that the parties treated her as an expert in her field of endeavor.

The record reflects that appellant, while incarcerated and on his own volition, went to Matthews where he requested that she give him "specific kinds of help" that related to his inability to sleep and eat, and his problems with depression. Matthews saw appellant approximately eight times, but never administered any clincial tests nor did she prescribe any medication for him. This occurred between July, 1979 and December, 1979. Matthews also had occasion to observe appellant when he was outside of her office in the prison yard, and once

observed him fighting with another inmate, in which fight she stated that appellant "shattered" the other inmate's jaw. Matthews testified that from her interview sessions with appellant she concluded that "[h]e was frequently depressed"; "he has a wide range of characteristics from being a very nice, a very congenial person to being placating, manipulative, and from time to time, threatening and violent. He had a hard time controlling his temper... [T]he intensity [of emotion] with Phil is very great ... but the intensity of emotion that he felt was out of proportion to the actual problem... He has this wide range of behavior as crying and maybe being very happy or very joyous or very sad or very angry, and he didn't seem to be able to control which of those things came out in any given situation." From her interviews with appellant, Matthews concluded that appellant did not want to be and could not be rehabilitated, "[u]nless he were given some intensive psychotherapy and he desired to have that kind of change. It would take quite a bit of doing." Although Matthews further testified that appellant's propensity to commit future acts of violence was "unpredictable", she also testified that in her opinion there was a probability that appellant would continue to commit criminal acts of violence that would constitute a threat to society. Matthews admitted in her testimony that another psychologist might "draw different conclusions and opinions [of appellant]" than she did.

Appellant's sole objection at trial to Matthews' testimony was the following: "We have objections to any questions or answers in regard to the relationship between [Matthews] the psychologist and the inmate [appellant]." It is highly questionable whether the claimed error is properly before us for review. Nevertheless, given the fact that appellant has been assessed the death penalty, we will assume that his contention is properly before us for review.

Appellant argues that "the introduction of the prison psychologist from her communications with Appellant during his compelled incarceration period while in a Virgi-

nia Correctional institution in 1979 was and remains privileged under Article 5561h, Vernon's Ann. (Texas) Civil Statutes and therefore was not available to the State for any purpose. (Citations omitted.)" Appellant also argues that such testimony was admitted in violation of *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). At no time, however did appellant expressly invoke in the trial court the provisions of the above statute, and, although appellant brought out during his voir dire examination of Matthews the fact that Matthews did not give him the *Miranda* warnings when she interviewed him, see *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at no time did appellant complain, either expressly or implicitly, that Matthews' testimony was obtained in violation of the holding in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), which was decided on May 18, 1981, almost four months to the day after appellant committed the offense at bar and before he was tried in this cause.

In *Smith,* supra, the Supreme Court held that a psychiatrist's testimony on future dangerousness, which had been obtained pursuant to a court-ordered psychiatric examination only to determine the accused's competency to stand trial, was inadmissible evidence because it violated the accused's Fifth Amendment privilege against compelled self-incrimination and also violated the defendant's Sixth Amendment right to counsel because court appointed defense counsel was not notified in advance that the psychiatric examination would encompass the issue of future dangerousness.

We have diligently searched the record of this cause for an objection by appellant to Matthew's testimony on the basis of *Smith,* supra, error, but have yet to find such an objection, and appellant does not point to any place in the record where he objected in the trial court on this basis. In *Granviel v. State,* 723 S.W.2d 141 (Tex.Cr. App.1986), this Court held that a failure to object on the basis of *Smith,* supra, error, where the accused's trial occurs after *Smith,* supra, had been rendered, waived any *Smith,* supra, error, which we find

occurred here. Furthermore, given the facts upon which appellant relies on appeal to raise *Smith,* supra, error, and the facts that are in *Smith,* supra, we find appellant's reliance on *Smith,* supra, sorely misplaced. The record clearly reflects that Matthews' interviews with appellant were only done at appellant's insistence, and not at the command of Matthews or any other state official. Matthews' did not "compel [appellant] to speak [with her] where he would not otherwise [have done] so freely." *Granviel,* supra. Lastly, when Matthews spoke with appellant, she was not ordered by any court to speak with him.

Appellant's complaint, as it relates to *Smith,* supra, error, is overruled.

We will next determine whether appellant was entitled to invoke and have applied to this cause the provisions of Art. 5561h, V.A.C.S., as that statute was worded when appellant's trial occurred. This statute became effective August 29, 1979; was amended effective September 1, 1983, but repealed effective September 1, 1983, by order of the Supreme Court of Texas, "insofar as it relates to civil actions." Appellant's trial occurred in 1981. Insofar as it might relate to criminal prosecutions, the statute has been replaced by Rule 509, Tex.Rules of Crim.Evid., effective September 1, 1986. For prior discussion of Art. 5561h, supra, see *Ginsberg v. Fifth Court of Appeals,* 686 S.W.2d 105 (Tex.1985); *Ex parte Abell,* 613 S.W.2d 255 (Tex.1981); *Wimberly Resorts Property, Inc. v. Pfeuffer,* 691 S.W.2d 27 (Tex.App.—Austin 1985); *Heflin v. State,* 640 S.W.2d 58 (Tex.App.—Austin 1982), P.D.R. refused; *Gaynier v. Johnson,* 673 S.W.2d 899 (Tex.App—Dallas 1984); *Wade v. Abdnor,* 635 S.W.2d 937 (Tex.App.—Dallas 1982); *Tumlinson v. State,* 663 S.W.2d 539 (Tex.App.—Dallas 1983), P.D.R. refused. Also see Art. 4495, V.A.C.S., and the discussion pertaining thereto that is found in this Court's decision of *Blunt v. State,* 724 S.W.2d 79 (Tex.Cr.App.1987).

We find that the State, in its response to appellant's contention, correctly argues that appellant cannot rely upon the provisions of Art. 5561h, supra, for several rea-sons: (1) Matthews was not shown to be authorized to practice *medicine* either in Virginia or Texas, or in any other State of the Union for that matter, and (2) there is no evidence that Matthews was licensed or certified by the State of Texas in the diagnosis, evaluation, or treatment of any mental or emotional condition or disorder. We also find that appellant did not testify or offer any testimony or evidence that when Matthews interviewed him he reasonably believed that she was authorized to practice medicine in Virginia or reasonably believed she was licensed or certified by the State of Texas in the diagnosis, evaluation, or treatment of any mental or emotional condition or disorder. Therefore, we find and hold that appellant has failed to satisfy one very important condition precedent in his claim that Matthews was prohibited from testifying because of the above statute, namely, Matthews was shown to come within the provisions of the statute.

Our disposition of appellant's contention does not stop here however, because, given the fact that the situs of the interviews between appellant and Matthews occurred in Virginia, we must determine whether, under conflicts of law, Matthews would have been prohibited from testifying in a Virginia criminal prosecution about her conversations with appellant, and the conclusions she drew therefrom. Although the evidence did not establish that Matthews was either a licensed or certified "clinical-correctional" psychologist in Virginia, because the parties treated her as having been licensed or certified by the State of Virginia, we will assume for argument purposes that she was licensed or certified by that State. Under *Ex parte Mason,* 656 S.W.2d 470 (Tex.Cr.App.1983), it is proper for this Court on its own to seek out that law. Our travels have led us to the Legislative Reference Library of this State where we found The Code of Virginia.

The Code, see § 8.01–400.2, Civil Remedies and Procedure, which governs communications between counselors, social workers, psychologists and patients, is worded similarly to Art. 5561h, supra, except that it is restricted to *civil* actions. The Virginia Supreme Court held in *Gibson v. Com-*

*monwealth,* 216 Va. 412, 219 S.E.2d 845 (1975), that in Virginia there exists no physician-patient privilege in a criminal prosecution. See Virginia Code provision § 8.01–399, supra, which governs the physician-patient privilege in that state. We find that such holding would also govern the psychologist-patient relationship. Thus, under the doctrine of conflicts of law, Virginia law is of no assistance to appellant in his claim that the trial court erred in permitting Matthews to testify at the punishment stage of his trial. Also see 12 *Tex.Jur.3rd Edition,* "Conflict of Laws"; Leflar, *American Conflicts of Law* (1968 edition), Section 123; 56 *Columbia Law Review* (1956); Weinstein, "Recognition in the United States of the Privileges of Another Jurisdiction," at 543.

Appellant's contention that the trial court erred in permitting Matthews to testify at the punishment stage of his trial is overruled.

▮ Appellant next claims that he is entitled to a new trial because the trial court over objection erred in permitting the State's witnesses George Drummond and Charles William Murphy to testify against him as reputation witnesses at the punishment stage of the trial. We disagree.

We first observe that Art. 37.071, V.A.C. C.P., provides, inter alia, that in a capital murder sentencing proceeding "evidence may be presented as to any matter that the [trial] court deems relevant to sentence." This Court has held that a defendant's reputation for having a particular character trait may be admissible evidence at the sentencing stage of a capital murder case. See, for example, *Nethery v. State,* 692 S.W.2d 686, 707 (Tex.Cr.App.1985).

The record reflects that the State called Drummond to testify at the punishment stage of the trial and he testified that he had formerly been appellant's parole officer in Virginia after appellant was released from the Virginia penitentiary in 1980. See *ante.* Drummond also testified that in his opinion appellant's reputation "in the community in which he lives for being a peaceful and law-abiding citizen" was bad. Drummond formed his opinion after having

spoken with appellant's neighbors, his friends, and members of his family that he, appellant, had when he lived in Virginia.

Murphy testified that he was a Virginia Trooper and in his opinion appellant's reputation "for being a peaceful and law-abiding citizen" was bad. Murphy formed his opinion after he had conversations with "The sheriff down in King and Queen County, Virginia and several other troopers ..., talking with citizens in King and Queen County in the Cothorville area where Mr. Tompkins resided when he was in Virginia."

Appellant relies upon *Wright v. State,* 609 S.W.2d 801 (Tex.Cr.App.1980), as authority for his contention that neither Drummond nor Murphy were qualified to testify to his reputation for being a peaceful and law-abiding citizen when he lived in Virginia. We strongly disagree with appellant.

We first find that appellant's reliance upon *Wright,* supra, is sorely misplaced. The facts in *Wright,* supra, show that the defendant in that cause grew up in Dallas and the "bad" reputation witness who testified against him was a highway patrolman who lived in San Antonio and worked exclusively in Bexar County. It appears that the patrolman came into contact with the defendant when he stopped appellant for violating some traffic law while in Bexar County. It also appears from the opinion that the sole basis for the reputation witness's testimony, that the defendant's reputation was bad, was a conversation that he had had with the prosecuting attorneys in that cause prior to the trial of the case. The defendant was tried in Dallas County. This Court held that the highway patrolman was not qualified to testify as a reputation witness against the defendant. In the concurring opinion that Judge Roberts filed in that cause, he correctly emphasized that a reputation witness's knowledge of another person's reputation for having a particular character trait or traits is gained by the members of the community in which the person lives or lived: "This appellant's community was in Dallas; he lived there and had been reared there. Yet the prose-

cuting attorneys called a reputation witness who never had worked in Dallas and who never had talked about the appellant to anyone other than themselves." *Wright*, supra, at 806, 807.

Here, however, both Drummond and Murphy's knowledge of appellant having a bad reputation for being a peaceful and law-abiding citizen was not limited as it was in *Wright*, supra, but instead rested on knowledge that they obtained from other persons in communities in Virginia where appellant had previously resided. Also see *Wagner v. State*, 687 S.W.2d 303 (Tex.Cr. App.1984) (On appellant's motion for rehearing); and *Jackson v. State*, 628 S.W.2d 446, 450, fn. 2 (Tex.Cr.App.1982).

We point out that appellant did not complain in the trial court, nor does he complain on appeal, that Drummond and Murphy were not qualified because the persons that they had had conversations with never specifically told them that appellant's general reputation for being a peaceable and law-abiding person was bad. See *Jackson*, supra. Notwithstanding this specific omission in the record, we nevertheless find and hold that given the fair import of the witnesses' testimony, such indicates that the persons with whom they had discussed appellant's reputation for not being a peaceable and law-abiding person told them that appellant's reputation for those traits was bad. Therefore, we hold that both Drummon and Murphy were qualified to express an opinion as to appellant's reputation for not being a peaceable and law-abiding person in the communities where they knew him and where he once resided. Cf. *Arocha v. State*, 495 S.W.2d 957 (Tex.Cr.App. 1973); *Stephens v. State*, 522 S.W.2d 924, 927 (Tex.Cr.App.1975); *Ables v. State*, 519 S.W.2d 464, 466 (Tex.Cr.App.1975).

Appellant's contention that Drummond and Murphy were not qualified "bad" reputation witnesses is overruled.

Appellant next contends that he should be granted a new trial because "final arguments of the State during the sentencing phase of trial was so clearly calculated as to inflame the minds of the jurors being of such character as to suggest the impossibility of withdrawing the impression produced on the jurors' minds."

Appellant also complains of another jury argument in the same point of error, that the same prosecuting attorney made at the punishment stage of the trial when she referred to a psychologist who testified for appellant as having "prostituted" himself when he testified on behalf of appellant. Appellant's objection to this argument was overruled by the trial judge.

We agree with appellant that neither argument was called for under this record, and both were clearly improper.

We find that appellant's first complaint goes to the fact that the prosecuting attorney referred to him in her jury argument "as an animal", to which comment trial counsel objected, the trial judge sustained the objection, instructed the jury to disregard, but overruled his motion for mistrial.

Although there appear to be decisions by this Court approving referring to the defendant as "an animal", we also find that there are many decisions of this Court which have reversed convictions because of such remarks as were made here. See the cases collated in *Erisman's Manual of Reversible Errors in Texas Criminal Cases* (1956 edition), § 529. Whether such an argument will constitute reversible error, however, must be decided on an *ad hoc* basis.

Many years ago, in *Swilley v. State*, 114 Tex.Cr.R. 228, 25 S.W.2d 1098 (1929) (On original submission), Judge Lattimore of this Court pointedly remarked that "there is abundant room for legitimate discussion of the testimony and the law applicable, without indulging in personal abuse of the man who is at the bar of justice." (1099). Such an argument as was made here served no legitimate purpose except to jeopardize the State's case on appeal. In *Grant v. State*, 472 S.W.2d 531, 534 (Tex. Cr.Cr.App.1971), Presiding Judge Onion was quick to point out for the Court that it is often difficult for members of this Court to understand why a prosecuting attorney would engage in argument that is similar,

but not as aggravated, as occurred in this cause. Judge Onion correctly pointed out that "Abuse is not argument, and vituperation is not logic ... It takes far less talent to indulge in abuse than in making an intelligent assessment of the facts and the law to aid the jurors in their task."

This Court should not have to point out that comments by the attorneys should always be confined to the record and the legitimate deductions from the testimony of the witnesses. Notwithstanding that we do not approve the above argument that referred to appellant as "an animal", it is axiomatic that it is not every improper argument made by a prosecuting attorney to the jury that requires reversal. Before reversal may occur, because of improper prosecutorial jury argument, the argument must be examined in light of the entire record and must be extreme or manifestly improper, violative of a mandatory statute, or inject new facts into the case that are harmful to the defendant. Generally, an instruction by the trial judge to the jury to disregard the argument will be sufficient to cure any error. In this instance, the trial judge instructed the jury to disregard the argument. Given the facts of the case and the trial judge's prompt instruction to the jury to disregard, we are unable to say that such argument by the prosecuting attorney might have had any effect at all on the jury's decision to answer the two special issues in the affirmative. "This Court has held that language [by a prosecuting attorney], which may be objectionable, may also be so illogical, fanciful or extravagant as to require the conclusion that it could not have influenced the jury in arriving at their verdict." *Brown v. State*, 171 Tex. Cr.R. 692, 353 S.W.2d 425, 430 (1962). We find such statement applicable here.

Appellant's second complaint gives us more concern. There is absolutely nothing in this record that might have justified the prosecuting attorney stating that the appellant's psychologist "prostituted himself on the witness stand." We find that when a prosecutor or a defense attorney uses the opprobrious term "prostitute" against a witness in his jury argument,

when such is not supported by the evidence, the term might mean to many jurors what Judge Henderson of this Court expressed almost 100 years ago in *McCray v. State*, 38 Tex.Cr.R. 609, 44 S.W. 170 (1898): "In common experience, it is known that persons who are so morally degraded as to ply their vocation as common prostitutes are not on a plane with the mass of people who follow legitimate and honorable vocations, in the matter of integrity. As a general rule, they are no more capable of telling the truth than one who has been convicted of a felony, or of some misdemeanor involving moral turpitude, and they are not more worthy of belief than such a one." Also see *Cravens v. State*, 687 S.W.2d 748 (Tex.Cr.App.1985). The trial judge clearly erred in not sustaining appellant's objection, albeit it was a general one. Also see and compare *Gomez v. State*, 704 S.W.2d 770 (Tex.Cr.App.1985).

Notwithstanding our strong disapproval of the prosecuting attorney's argument, referring to the defense witness as "a prostitute", we find that appellant did not properly and timely perfect the error. First, he has not set forth his contentions in separate points of error. See, for example, *Kendrick v. State*, 481 S.W.2d 877 (Tex.Cr.App.1972). Second, his general objection, "objection", amounts to no objection. Thus, appellant has waived his complaint. Cf. *Zillender v. State*, 557 S.W.2d 515 (Tex.Cr.App.1977). Notwithstanding our holding, we trust that such argument, unless the record makes it absolutely clear that it is called for, will not again in a court of law of this State be uttered by either an attorney for the State or an attorney for a defendant.

Appellant's contentions are overruled.

Appellant complains in his last point of error of action by this Court, "The Court of Criminal Appeals erred in overruling Appellant's motion to exceed the statutory limits of Rule 202 of the Rules of Appellate Procedure in that the denial of same and the rejection of the Appellant's original brief on appeal deprives this Appellant of his right to an effective appeal process from a judgment of conviction

where the sentence imposed is death by lethal injection."

Under Rule 202 of the Appellate Rules, as it existed when appellant attempted to file his first brief, which was 144 pages in length, this brief clearly exceeded the then 50 page rule limitation, and this Court properly denied him permission to file that brief. Thereafter, appellant timely filed a well written brief that numbered only 47 pages. We have carefully compared the two briefs and find that, other than the original brief being more detailed, substantively they are the same.

In considering all of appellant's points of error, we have carefully considered his contentions as set out in his original brief as well as the brief that was timely and properly filed, which we find is all that appellant is asking us to do in his last point of error.

Therefore, appellant's last contention is overruled.

Having carefully reviewed all of appellant's contentions, and finding that none merit this Court reversing appellant's conviction or sentence of death, the trial court's judgment of conviction and sentence of death are affirmed.

ONION, P.J., and McCORMICK and DUNCAN, JJ., concur in the result.

APPENDIX "A"

C.C.A. # 68870

TRIAL COURT # 329,004

The State of Texas

v.

Phillip Daniel Tompkins

In The 230th Judicial District Court of Harris County, Texas

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Order of the Court of Criminal Appeals entered April 20, 1987, a hearing was held in the 230th District Court of Harris County, Texas, on June 3rd and 4th, 1987 regarding possible exclusions made in violation of "BATSON" during jury selection in the Defendant's trial for capital murder. The following findings of fact and conclusions of law are made pursuant thereto:

1. The defendant is an identifiable minority, i.e. black.

2. There were no blacks on the jury that tried the defendant and assessed the death penalty.

3. The complained of State's peremptory challenges were exercised against black venirepersons.

The foregoing facts constitute a prima facie case under BATSON.

4. The venireperson David Miller was excused by the State by the use of a peremptory challenge.

5. Mr. Miller had originally, on questioning by the Court, disqualified under *Witherspoon,* and was subsequently "rehabilitated" upon questioning by the defense.

6. The State's excusal of Mr. Miller was neutral, relative, clear and legitimate as required by BATSON and was not racially motivated.

7. The venireperson Belinda Sutphen was excused by the State by the use of a peremptory challenge.

8. Ms. Sutphen had originally, on questioning by the Court, disqualified under *Witherspoon,* and was subsequently "rehabilitated" upon questioning by the defense.

9. The State's excusal of Ms. Sutphen was neutral, relative, clear and legitimate as required by BATSON and was not racially motivated. Ms. Sutphen also vascilated in her answers to the extent that she was admonished by the Court during voir dire.

10. Venireperson Isabella Thomas was excused by the State by the use of a peremptory challenge.

11. Ms. Thomas at first said she could not follow the law on circumstantial evidence that was in effect at the time of the voir dire and upon which the State relied for a conviction, and though she later indicated she could follow that

law if so instructed by the Court, the prosecutor was skeptical about her ability to do so.

12. The State's excusal of Ms. Thomas was neutral, relative, clear and legitimate as required by BATSON and was not racially motivated.

13. The venireman Frank E. Samuel was excused by the State by the use of a peremptory challenge.

14. Mr. Samuel, though not illiterate, could not satisfactorily fill out juror information sheets and questionnaires, and obviously had extreme difficulty with legal concepts. The prosecutor felt that he would have great difficulty in understanding the complexities of a capital case. Although less time was spent questioning Mr. Samuel than on some other jurors, it was obvious that that was motivated by what was perceived as Mr. Samuel's inability to understand and comprehend the issues, and not on the fact that he was black.

15. The State's excusal of Mr. Samuel was neutral, relative, clear and legitimate as required by BATSON and was not racially motivated.

16. The venireperson Leroy Green was excused by the State by the use of a peremptory challenge.

17. Mr. Green testified that over the years he had frequently changed his opinion on the propriety of the death penalty and that his wife was opposed to the death penalty; he frequently made non verbal answers or "yeahs"; there was no valid communication between the prosecutor and the juror. The juror had problems with and vascillated regarding his ability to follow the law of causation and indicated that he might require evidence of premeditation.

18. The State's excusal of Mr. Green was neutral, relative, clear and legitimate as required by BATSON and was not racially motivated.

/s/ Joe Kegans
JOE KEGANS, Judge
230th District Court
Harris County, Texas

STATE'S
EXHIBIT 52

## STATEMENT OF PERSON IN CUSTODY

Date **1-28-81**

Time **8:07PM**

Statement of ___PHILLIP DANIEL TOMPKINS___
taken in Harris County, Texas.
Prior to making this statement I have been warned by ___C. W. KENT___
_____, the person to whom
this statement is made, that:

1) I have the right to remain silent and not make any statement at all and any statement I make may and probably will be used against me at my trial;
2) Any statement I make may be used as evidence against me in court;
3) I have the right to have a lawyer present to advise me prior to and during any questioning;
4) If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning and;
5) I have the right to terminate the interview at any time.

Prior to and during the making of this statement I knowingly, intelligently and voluntarily waive the rights set out above and make the following voluntary statement:

Last Sunday night around midnight I was on S. Main near the ROAD RUNNER INN in PIZZA's mothers car. The car is a 1973 MONTE CARLO with a black top and a maroon bottom. While I was out there, I saw this white girl drive by in a light colored small car. The girl was driving south on Main and I followed her. I followed her for about fifteen or twenty mintues and she made a couple of turnes. It was foggy and I was smoking a marijuana cigarette and the girl had stopped at a stop sign and I accidently bumped into her from the rear. I was driving real slow when I hit her car. After I hit her, the girl got out and said, "What's the fuck wrong with you?" She was mad because I had bumped into her. I backed up a little bit and put the car in park and got out of the car. She was saying something about calling the cops. I told her that I was sorry and that I didn't mean it. She told me that I should slow down and read the signs. This is when these crazy notions started going through my mine. I saw her holding her purse in her right hand and I was thinking that she might have enough money to get me and PIZZA to Austin. PIZZA is my common law wife, her name is LISA MILES and she is a white girl.

I was thinking about snatching her pocket book but I thought that she would call the cops and I wouldn't get too far so I told her to get into my car. She asked me, "For what?" I told her that I wanted her pocket book and her money. She told me to go ahead and take her pocket book. She told me that she didn't have much money. I told her that I was going to take her with me because I was afraid that she would call the police. At first she said that she wasn't going anywhere. I put my hand on her back and told her to come on. She said, "Don't hurt me". She went on and got into the car with me when I told her that I wasn't going to hurt her. She got into the front seat with me and I drove off. I drove back toward town and over by the ASTRO DOME and down this dirt road, and to this field. There was a house out there and a dog was barking. I took the girl by this tree and tied her up. I just tied her up and asked her could she breathe. I tied her arms with a blue sheet and I tied her feet with another piece of the blue sheet. I put a piece of the blue sheet in her mouth and then I tied a checkered shirt around her mouth, I think it was blue, so that she couldn't spit out the sheet.

While we was driving back to town, I was telling the girl about me and PIZZA's problems, our financial problems. The girl asked me if we needed

Signature of Person Making Statement

Witness

Witness 10:00 PM
 1-28-81

Page __1__ of __4__ pages

HPD Form No. CTB-0002

## STATEMENT OF PERSON IN CUSTODY

Date ___1-28-81___
Time ___8:07PM___

Statement of ___PHILLIP DANIEL THOMPKINS___
taken in Harris County, Texas.
Prior to making this statement I have been warned by ___C.W.KENT___
___, the person to whom
this statement is made, that:

1) I have the right to remain silent and not make any statement at all and any statement I make may and probably will be used against me at my trial;
2) Any statement I make may be used as evidence against me in court;
3) I have the right to have a lawyer present to advise me prior to and during any questioning;
4) If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning and;
5) I have the right to terminate the interview at any time.

Prior to and during the making of this statement I knowingly, intelligently and voluntarily waive the rights set out above and make the following voluntary statement:

some money. When I told her that I did, she started pulling out all of the credit cards. She said that she didn't have very much money and that all she had was about $20 and some change. I told her that she didn't have to pull all that stuff out of her purse. She asked me how far was I going to take her from her car and I told her that I was going to take her close to the freeway. She asked me if I would leave her a quarter to call her husband and I told her that I would let her have her whole purse. She told me that if I needed some money that she had a QUICK SILVER BANK CARD. She asked me how much I needed and I told her that I needed about $200 or $300. She said that she would give it to me because she knew that she wouldn't get it back. We laughted about what she said and she gave the card. She told me how to use the card. She said, "Push SICK and then $300". I told her that I was going to tie her up then so she couldn't call the police and the police catch me at the bank. This is when I tied her up. I told her that I would be back in a few minutes and untie her.

I left her tied to the tree. I tied her hands to the tree so that she couldn't get away. She was setting up when I left. I can't remember if I had her hands or her legs tied to the tree. I drove to the bank, she had told me that the bank was at FONDRED at BISSONETT. I parked my car (Lisa's mothers MONTE CARLO) about 100' from the teller. I walked up to the QUICK SILVER teller and put the card in and pushed some buttons like the girl told me to. The machine gave the total. It showed $3,000. I pushed all of the buttons and I messed up. I read what the sign said, and then I pushed a $1,000 and a bunch of money came out, a $1,000. After I got the money or before I got the money, this janitor at the bank came up to me. He was cleaning up around the area, he was cleaning up with a broom. He was putting trash on top of the camper of this blue and white pick up truck. When he came up to me, he asked me what was wrong. I told him that nothing was wrong, that I was checking to see how much money we had in the bank. He went on sweeping up, he said something, but I don't know what. I drove down BISSONETT from the bank towards Stella Link. I got to BELLAIRE at BISSONETT and I saw this cab and I waived him down and told him to take me to the bank. I parked my car in a parking lot near another bank and I got into the cab. There was a white guy driving the cab, it was a yellow cab. The white guy looked about 23 or 22. I told him where to go and he took me back to the bank at FONDREN

___
Signature of Person Making Statement

_[signature]_

Witness
___
_[signature]_ 10:00 PM
Witness
1-28-81

STA MENT OF PERSON IN CUS DY

Date 1-28-81

Time : 8:07PM

Statement of _____ PHILLIP DANIEL THOMPKINS _____
taken in Harris County, Texas.

Prior to making this statement I have been warned by __ C.W.KENT ____
_____, the person to whom
this statement is made, that:

1) I have the right to remain silent and not make any statement at all and any statement I make may and probably will be used against me at my trial;
2) Any statement I make may be used as evidence against me in court;
3) I have the right to have a lawyer present to advise me prior to and during any questioning;
4) If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning and;
5) I have the right to terminate the interview at any time.

Prior to and during the making of this statement I knowingly, intelligently and voluntarily waive the rights set out above and make the following voluntary statement:

at BISSONETT. I got out and tried to use the card again but it didn't work. The machine said to come back tomorrow. I went back and got into the cab and went back and got my car. I asked the cab driver how to get to STELLA LINK. I knew where I was at and how to get there, I was just messing around with him. I got into my car and I drove back to where I had tied the girl up at. When I got there, I parked my car down the road aways because I wanted to walk to where the girl was at just in case the police might be there. I walked up in the bushes and looked around. I didn't see anybody. I saw the girl and she wasn't moving. I went up to the girl and she was laying down on the ground and she wasn't moving. I checked her pulse and I couldn't feel one. I got scared and I ran to the car and left. I drove to Telephone road and I stopped on Telephone and called the police. The lady that answered said, "Hello Houston Police". I said, "Hello, I---". I was going to tell her what had happened but I hung up. This was at around 3:00 or 4:00 in the morning. I hung up and drove to EARL NEWBILL's house on Telephone at his apartment #130. Me and PIZZA have been staying with them for about three days.

When I got to Earls house he wasn't home. Earl was playing cards and I went to find him. I found him at FRENCHIES trailer house playing BLACK JACK. I played cards for a few minutes with them and me and Earl went back to the house.

I just remembered that I had taken the girls watch when I had tied her up and I put it in her pocket book. It should still be in there. It was a silver watch, small with hands.

That night while we were at EARLS house PIZZA saw the purse and she asked me where I had gotten at. I told her that I had snatched it from some lady. I told her that she could have the purse, and she said that she didn't want it. The next day, she was going to go ahead and make me happy and she took the purse. Early MONDAY morning we headed for AUSTIN sometime around 5AM. While we was going down I 10, I had a flat tire and two black guys stopped to help us. They was in a dark blue CHEVY, I believe it was a Chevy. They took me to a service station and I got my spare tire aired up. The two guys told me that they would sell me two tires and they took me somewhere back toward Houston. They took me to his brothers house, the drivers brother.

Signature of Person Making Statement

Witness

Witness 10:00 PM 1-28-81

Page __3__ of __4__ pages

HPD Form No C18 0002

**224**

Date _____ 1-28-81

Time : _____ 8:07PM

Statement of _____ PHILLIP DANIEL THOMPKINS

taken in Harris County, Texas.

Prior to making this statement I have been warned by _____ C.W.KENT

_____, the person to whom this statement is made, that:

1) I have the right to remain silent and not make any statement at all and any statement I make may and probably will be used against me at my trial;

2) Any statement I make may be used as evidence against me in court;

3) I have the right to have a lawyer present to advise me prior to and during any questioning;

4) If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning and;

5) I have the right to terminate the interview at any time.

Prior to and during the making of this statement I knowingly, intelligently and voluntarily waive the rights set out above and make the following voluntary statement:

When we got to the guys house, his brother had a Monte Carlo and I bough' the tires off that car. I paid him $25 for the tires. I gave him $5 for helping me. They drove me back to where our car was at on the freeway. I changed the tire on the car and we drove on to AUSTIN.

While I drove to Austin, I cut off I-10 at COLUMBUS and I drove through La Grange. It was Texas 71 (Highway). Before we got to Columbus we had stopped and spent the night at some Motel. The next day we drove on to Austin and through LaGrange. Somewhere in LaGrange I stopped and threw everything that was in the girls purse in some bushes off the side of the road. I threw everything except the credit cards and the purse away. I think the girls watch is still in the car.

I want to saw that we didn't spent the night at the motel, we stayed there from about 9AM to about 3PM Monday. We got to Austin Monday evening at about 5PM or 6PM. We went to PIZZA's mothers trailer and we stayed there for about two hours and then we checked into a hotel. We checked in at the IMPERIAL 400 HOTEL on S. CONGRESS. This is where we have been staying at.

Today, Wednesday 1-28-81, we drove back to PIZZA's mothers trailer at the KOA CAMP GROUNDS in Austin. This was around about 1PM. We had been there for about two minutes when the cops came there and arrested me and PIZZA. When they handcuffed me, I broke away and run from the police and they caught me. I want to say that PIZZA didn't have nothing to do with what I did. She didn't know about the girl.

I want to say that I have not been promised anything to make this statement. Detective gave me a cup of coffee and I smoked several cigarettes. I have been warned of my rights and I understand them and I want to give this statement. It is the truth to the best of my knowledge.

_____ Signature of Person Making Statement

_____ Witness

_____ Witness

Page __4__ of __4__ pages

CLINTON, Judge, dissenting.

This cause presents once again the conundrum of two lesser "culpable mental states:" recklessness and criminal negligence. Opinion, at 210–213. The majority ultimately finds no evidence raising either. However, there are problems in its determinations of law germane to making those findings.[1]

This cause provides an opportunity to consider that interpretations and applications of § 6.03(c) and (d), in opinions primarily by Judge Odom, were accepted by the Court for several years, only to be suddenly rejected in a recent opinion crafted by Judge W.C. Davis, and to determine which view is correct.[2] Remember, strictures placed on rights of an accused in one case will also have an impact on the State in satisfying its burden of proof in another. See note 7, *post.*

Under § 6.03(c) and (d), "risk" is an essential condition; it is created by acts of accused, here with respect to result of his conduct. It must be both "substantial" and "unjustifiable." Once he has created that kind of risk an actor is either aware of it or *ought* to be aware of it. The Court has characterized the former as "conscious risk creation," the latter as "inattentive risk creation." *Lewis v. State,* 529 S.W.2d 550, 553 (Tex.Cr.App.1975). Practice Commentary to § 6.03.[3]

An awareness may be inferred from the facts, but that one *ought* to be aware is a judgmental factor, along with others, at work here.[4] A failure to comprehend that

---

1. At the outset, in the course of discussing entitlement to a charge on a lesser included offense, on one page the opinion iterates usual rules about considering *"all* the evidence presented," and if evidence "from *any* source raises the issue" an appropriate charge must be given, citing correct authorities for those propositions. *Id.,* at 210. (All emphasis is mine throughout unless otherwise noted.) On the next page, however, the opinion says the fact that the State's proof of the greater offense "also proved the lesser offense ... does not, standing alone, entitle appellant to a charge of the lesser included offense," citing *Cordova v. State,* 698 S.W.2d 107 (Tex.Cr.App.1985)—which was earlier cited to support the first rule! Both cannot be right, and from our cases the second is wrong.

 The only authority for the second is "See *Aguilar* [*v. State,* 682 S.W.2d 556 (Tex.Cr.App. 1985) ], and seeing it makes abundantly clear that *Augilar* holds no such thing. Compare *Aguilar,* at 558: "Merely because a lesser offense is included within the proof of a greater offense, however, *does not always* warrant a jury charge on the lesser offense." But that it is so included may warrant the charge. *Bell v. State,* 693 S.W.2d 434, at 442 (Tex.Cr.App.1985). Thus we may look to the proof adduced by the State, just as the majority does here. See *Campbell v. State,* 571 S.W.2d 161, 162 (Tex.Cr.App.1978).

 First the majority says appellant's conduct precludes an inference "that he was then unaware of the risk his conduct created," and speculation that he did not intend the result "does not change his *awareness or perception* of the risk his conduct created," and speculation that he did not intend the result "does not change his *awareness or perception* of the risk his conduct created." Opinion, at 212. So much for criminally negligent homicide. Next it says, "Without evidence that appellant acted

recklessly in causing the death of his victim [involuntary manslaughter *was not raised*]." *Id.,* at 212. But the majority had just found appellant *was* aware of the risk.

2. The Odom view takes an analytical approach to the facts of the matter and a weighing of judgmental factors by a factfinder, rather than looking for evidence that directly and nicely fits either socalled "mental state." In these two instances more than many others, the several judgment calls must be left to factfinders. See *Giles v. State,* 617 S.W.2d 690, 691 (Tex.Cr.App. 1981); *Dillon v. State,* 574 S.W.2d 92, 94 (Tex. Cr.App.1978)—both written by Judge Odom. See also *Lopez v. State,* 630 S.W.2d 936 (Tex.Cr. App.1982), by Judge McCormick, following *Giles* and *Dillon.* Compare *post* the Davis evidentiary view in, e.g., *Simpkins v. State,* 590 S.W.2d 129, 134 (Tex.Cr.App.1979), and *Thomas v. State,* 699 S.W.2d 845 (Tex.Cr.App.1985); see my dissenting opinion in the latter.

3. *"Criminal negligence* ... does not require consciousness of risk. Rather the definition of criminal negligence in Subsection (d) inquires of the factfinder whether the actor *ought* to have been aware of the risk. As in recklessness, the risk must be substantial and the failure to perceive it an unjustifiable and gross deviation from the ordinary standard of care; however, the actor's conduct is weighed against an objective standard, that of the ordinary prudent man." (emphasis in original).

4. "The adjectives 'substantial,' 'unjustifiable,' and 'gross' in the definitions ... are admittedly vague and intended only to focus on the judgmental factors the fact finder must weigh.... As forthrightly stated by the Model Penal Code reporter:

 'Some principle must be articulated, however, *to* indicate what final judgment is de-

concept is, in my view, revealed in two sentences written by Judge Davis in his panel opinion in *Simpkins v. State*, 590 S.W.2d 129 (Tex.Cr.App. 1979), *viz*:

> "However, the evidence in this case did not raise the issue of [negligent homicide]. *No evidence indicates* that the appellant possessed the requisite culpable mental state for negligent homicide, i.e., that he *ought* to have been aware of a substantial and unjustifiable risk."

*Id.*, at 134. (Second emphasis is by the Court.) That notion lay dormant for a while, only to be revitalized by Judge Davis in *Thomas v. State*, 699 S.W.2d 845 (Tex. Cr.App. 1985).

Following behind *Thomas*, *Mendieta v. State*, 706 S.W.2d 651, 653 (Tex.Cr.App. 1986), changed the formulation somewhat: "It is encumbent [sic] that the record contain evidence showing an *unawareness* of the risk before a charge on criminal negligent homicide is required. *Thomas v. State*, supra." [5]

That a person "ought to be aware" is not a matter of fact, readily susceptible to direct testimonial proof.[6] Whether under given facts and circumstances one "ought to be aware" of risk is a value judgment—a matter of ordinary care, caution and prudence. Illustrative is *Dockery v. State*, 542 S.W.2d 644 (Tex.Cr.App. 1976) (Opinion on Rehearing), *viz*:

> "We *conclude* that the *actions of appellant were sufficient to indicate that he ought to have been aware of the substantial and unjustifiable risk* that his conduct might injure and kill the deceased, at whom the pistol was quite obviously pointed at the time it was fired. Clearly, the risk was of such a nature and degree that it constituted a gross deviation from the standard of care prescribed by Sec. 6.03(d)."

*Id.*, at 648.[7]

In *Hunter v. State*, 647 S.W.2d 657 (Tex. Cr.App. 1983), implicitly the Court went through a similar exercise. After reciting the facts and stating general propositions of law regarding charging of lesser of-

---

manded after everything is weighed. There is no way to state this value-judgment that does not beg the question in the last analysis; the point is that the jury must evaluate the conduct and determine whether it should be condemned. * * * * The jury must find fault and find it was substantial ...'"
Practice Commentary following § 6.03.

**5.** In *Thomas*, disdaining *stare decisis*, a majority did indeed criticize several prior opinions of the Court, *viz*:

> "The attendant circumstances from which the defendant's mental state can be inferred must be collectively examined in light of the definition of criminally negligent conduct. See V.T. C.A. Penal Code, Sec. 6.03(d). In this respect [two prior opinions] are overbroad because they rely only on the pointing of a loaded weapon as being sufficient to raise criminally negligent homicide. *Other evidence* raising the issue of whether or not a defendant was aware of the risk *must* be presented before such charge is required."

*Thomas*, supra, at 850; in note 2, one of the two, *Giles v. State*, 617 S.W.2d 691 (Tex.Cr.App. 1981), is faulted for not providing "enough information from which to determine whether the defendant *ought to have but did not perceive* a substantial and unjustifiable risk in pointing a gun he knew was loaded at another." That criticism demonstrates the author of *Thomas* did not understand the issue in *Giles* refusal to

charge on *"reckless" involuntary manslaughter*, not criminally negligent homicide; full facts of the incident *as claimed by accused* are excerpted from his confession and reproduced in the opinion. See *Giles*, at 691. In context the issue is, after all, defensive in nature and the question is whether *some* evidence raised it, not general evidentiary sufficiency. *Moore v. State*, 574 S.W.2d 122, 124 (Tex.Cr.App. 1978).

**6.** Are witnesses to be permitted to say that accused was or was not obliged to be aware of a substantial and unjustifiable risk? Neither is a statement of fact; each is nothing but an expression of pure opinion. The factual evidence before the factfinder remains the same, and the "ought" requirement is for the factfinder to impose. See *ante*, n. 3.

**7.** *Thomas* speciously says, "The value of *Dockery* is limited because the rationale is not entirely clear as it focused on the distinction between voluntary action and intentional and unintentional acts." *Id.*, at 850. Clarity, like Beauty, is in the eye of the beholder. Accused was convicted of negligent homicide in the first degree under our former penal code; after setting out allegations and essential proof, the Court stated, "The issue then is whether the conduct alleged and proved is an offense under the new Code." *Dockery*, at 647–648. The Court concluded it was, namely, criminally negligent homicide denounced by V.T.C.A. Penal Code, § 19.07(a). *Id.*, at 650.

fenses, the Court sets out verbatim § 6.03(d), underscoring the "ought to be aware" et cetera clause. Reprising salient testimony of appellant, the Court concluded, "This testimony raised an issue as to whether appellant was negligent *in not perceiving the risk* which his conduct created." *Hunter,* supra, at 659. Obviously, from its treatment of the issue the Court had first concluded a jury could reasonably hold that accused ought to have been aware of the risk and he failed to perceive it.[8]

Unlike all homicide cases discussed *ante,* where death resulted from use of a deadly weapon, here the cause of death is suffocation caused by a gag inside and in the back of mouth of deceased. Appellant did not testify, and content of his written confession was not before the jury; he did not affirmatively present witnesses on his behalf. So basically the facts are appellant abducted deceased, gagged and tied her up and to a tree.

Following the Davis view, the plurality would have the Court find appellant was not entitled to instructions on criminally negligent homicide and "reckless" involuntary manslaughter. What of the Odom view?

That a risk was thus created cannot be disputed. "If it is not a risk of which one ought to be aware, then neither criminally negligent homicide nor involuntary manslaughter would [be] shown." The risk created by appellant was death of his victim. "Upon consideration of recklessness versus criminal negligence, whether one is aware of a requisite risk or simply should be aware of it, is a conclusion to be drawn through inferences from all the circumstances by a trier of fact." The jury was not given an opportunity to make any such conclusion. "Whether one 'ought to be aware' of the risk is a matter of the character of risk involved." Under the circumstances a jury could have regarded a risk of death to be "substantial" and surely "unjustifiable." "The issue [in involuntary manslaughter] is ... whether, given all the circumstances, it is reasonable to infer that the particular individual on trial was in fact aware of the risk." The jury could just as well have made that inference. *Nash v. State,* 664 S.W.2d 343, 344 (Tex.Cr.App. 1984); *Lopez v. State,* 630 S.W.2d 936, 941–942 (Tex.Cr.App. 1982), quoting approvingly from *Dillon v. State,* 574 S.W.2d 92, at 94 (Tex.Cr.App.1978), and "seeing also" *Giles v. State,* 617 S.W.2d 690 (Tex.Cr.App. 1981).[9]

*Nash v. State,* 651 S.W.2d 432 (Tex.App. —Dallas 1983), involved an automobile collision and accused was convicted of involuntary manslaughter; in support of his claim that evidence raised criminally negligent homicide and therefore the trial court erred in overruling his requested instruction thereon, appellant pointed to certain medical testimony in support of his insanity defense, to the effect that he had been rendered "unaware of the dangers that confronted [him.]" The Dallas Court of Appeals accepted that "the medical testimony is evidence that appellant was *not aware of the risk* because of mental disease;" however, it found that the standard is whether an accused "ought to be aware" —not "whether he was in fact unable to be aware." The Dallas Court concluded that *"the evidence* relied on by appellant does not reach the question of whether appellant 'ought to be aware' of the risk," and accordingly held that *"the requisite evidence* sufficient to raise the issue of criminally negligent homicide is not shown," thus no

---

8. In *Mendieta v. State,* 706 S.W.2d 651 (Tex.Cr. App. 1986), quoted and followed by Judge Teague, the Court distinguished *Hunter,* saying certain testimony "showed that Harris [sic] was unaware of the risk his conduct was creating." 706 S.W.2d at 653. That analysis of *Hunter* is too simplistic, however. The point is that the Court determined it was for the judgment of the jury whether he ought to have been aware of the risk and, if so, was negligent in failing to perceive it.

9. Only *Giles* involves a deadly weapon. The issue in *Nash* is entitlement to a charge of criminally negligent homicide in a automobile collision situation; in *Lopez* sufficiency of evidence to support a verdict for criminally negligent homicide in a similar situation; in *Dillon* sufficiency for involuntary manslaughter in starving a child to death. Judge Odom wrote all except *Lopez,* but it relies on *Dillon.*

error in refusing the instruction. *Id.*, at 433.

Such is the Davis view. Just three years ago eight members of this Court rejected it.

On petition for discretionary review, writing for the Court with only Judge Miller dissenting, Judge Odom expressed agreement with the ultimate conclusion of the Dallas Court, but found "its reasoning incorrect." *Nash v. State*, 664 S.W.2d 343 (Tex.Cr.App.1984), *viz*:

> "The focus in that court's opinion on the *absence of evidence* that appellant 'ought to be aware' of the risk *is not correct.* Whether one 'ought to be aware' of the risk is a matter of the character of risk involved. This conclusion is obvious from the statutory definition of criminal negligence in Sec. 6.3(d) ... which concludes with [a] statement about the character of the risk [quotation omitted]. The Court of Appeals *erroneously relied on a finding that the evidence did not show appellant ought to have been aware of the risk.* If it is not a risk of which one ought to be aware, then neither criminally negligence homicide nor involuntary manslaughter would have been shown."

*Id.*, at 344.

In *Lopez*, supra, another automobile collision resulting in death, rather simple facts of the matter are that appellant, "while driving a speeding car on a city thoroughfare at 11:30 p.m., ran a red light, and collided with the car driven by [another], causing the death of [a passenger]." *Id.*, at 941. If there were any direct or even circumstantial evidence bearing on "awareness," Judge McCormick does not allude to it. From Bubany, "The Texas Penal Code of 1974," 28 S.L.J. 293 (1974), at 305, he extracted, *inter alia*, "The trier of fact must make an *evaluative judgment* whether the actor's failure of perception constituted a gross deviation from acceptable standards of conduct." For the panel, Judge McCormick concluded:

> "[W]e find the evidence supports the jury finding that an ordinary or reasonably prudent person, in appellant's position, *OUGHT TO HAVE BEEN AWARE that a substantial and unjustifiable risk was created when he exceeded the speed limit and ran a red light on a city thoroughfare at 11:30 p.m.* [quoting extensively from *Dillon*, supra, at 94]."

*Id.*, at 941–942. Res ipsa loquitur, that is.

Exercising its collective judgment, a rational jury could have found appellant equally ought to have been aware that his acts created a substantial and unjustifiable risk of death, and that his failure to perceive that risk was a gross deviation from the proper standard of care.

When it appears an accused ought to be aware of a requisite risk, then also raised is the issue of whether he was in fact aware of the risk and consciously disregarded it. "Which of the two inferences regarding the accused's awareness of the risk is correct is a matter to be drawn from the circumstances by the jury. *Dillon v. State*, [supra]." *Giles*, supra, at 691.[10]

In the Odom view it was therefore error to refuse to charge the jury on the lesser included offenses of involuntary manslaughter and negligent homicide so that the jury could decide whether to infer recklessness or negligence or intent to kill. Instead, the jury was permitted only to convict of capital murder or to acquit. See *Giles*, at 691. In the Davis view it was not error.

---

10. *Moore v. State*, 574 S.W.2d 122 (Tex.Cr.App. 1978), demonstrates the converse. Accused was indicted for murder, convicted of involuntary manslaughter and on appeal asserted error in failing to charge on criminally negligent homicide.

Referring to certain testimony, Judge Dally wrote for a Court panel:

> "This evidence is sufficient to raise an issue of reasonable doubt whether the appellant was aware of but consciously disregarded a substantial but unjustified risk that her conduct would result in the death of deceased [i.e., involuntary manslaughter]. The jury, if it believed this evidence, could have found that appellant ought to have been, but was not, aware that her conduct would create a substantial and unjustifiable risk resulting in the death of the deceased [i.e., criminally negligent homicide]."

*Id.*, at 124. Accord: *Ormsby v. State*, 600 S.W.2d 782 (Tex.Cr.App.1980).

Because the plurality opinion is internally contradictory and will not solve the conundrum we have created, I respectfully dissent.