Orlando VARGAS, Appellant,

v.

The STATE of Texas, Appellee.

No. 01-87-00529-CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 26, 1989.

Karen Zellars, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Debbie Mantooth, Gilbert Alvarado, Asst. Dist. Attys., Houston, for appellee.

Before COHEN, O'CONNOR and WARREN, JJ.

## OPINION

WARREN, Justice.

A jury found appellant guilty of delivery of less than 28 grams of cocaine. The court found two enhancement paragraphs true and assessed punishment at 35 years confinement.

In two points of error, appellant complains that he was denied due process of

**358**

law because: (1) the State used its peremptory strikes in a racially discriminatory manner; and (2) the evidence produced at a post-trial evidentiary hearing, ordered by this Court, raises a substantial probability that perjured testimony was used at trial.

Houston police officers, C.E. DeAlejandro and Charles Villoutriex, testified that, on February 13, 1987, they were assigned to the Tactical Response Unit to work narcotics in southeast Houston. Because they were attempting to make a "buy-bust" in an area they knew drugs were sold, they were not in uniform, and were driving an unmarked car.

Each officer testified to the following facts. They were flagged down by Rufino Romero as they neared the intersection of 75th Street and Avenue L. Romero and Officer DeAlejandro spoke Spanish, but Officer Villoutriex did not. Romero asked what they wanted to buy, and DeAlejandro answered, cocaine. The officers followed Romero to an apartment building, where Romero met appellant in front of the building. The officers saw appellant hand Romero a small tinfoil packet. Romero walked back to the car, and handed the packet to DeAlejandro. DeAlejandro handed him 20 dollars. Romero then asked if Villoutriex wanted to purchase cocaine. DeAlejandro translated the question, and Villoutriex responded that he also would like to purchase cocaine. Romero returned to appellant, handed him the 20 dollars, obtained another packet, then returned and gave it to Villoutriex.

The officers testified that they immediately left the scene, radioed a description and location of the suspects to the raid team, and the raid team secured the apartment. DeAlejandro and Villoutriex returned to the scene, and confirmed their identification of the suspects. Appellant and Romero were arrested. Miguel Lopez, who was present in the apartment at the time of the arrests, was arrested for possession of marijuana.

Appellant did not testify, but he raised an alibi defense, which consisted of testimony from the other three persons present in the apartment at the time of the arrest.

Lucy Jiminez and Lopez testified to meeting with appellant at a restaurant in the vicinity of the apartment building. They went to the apartment thinking that the woman who lived there might accompany appellant to a dance that evening. Appellant was continuously in their presence from the time they met him, until the arrests took place. When they arrived at the apartment, Romero was there. Romero testified that it was his apartment. Neither Jiminez, Lopez, nor appellant left the apartment until the police arrived. Romero did leave and go down the stairs twice. The last time he returned to the apartment, he was followed by the police.

Although Lopez denied that the marijuana found on the premises was his, he admitted pleading guilty to a charge of marijuana possession, which was filed against him after the arrest. Romero testified that he acted solely on his own in dealing with the officers, and that appellant was not involved in the transactions. He testified that on each occasion the officers indicated they wanted cocaine, he went into the apartment building to procure the cocaine. Romero admitted to previous felony convictions, and also admitted pleading guilty to the charge arising out of this arrest. Further, he admitted signing a judicial confession that included the language "along with Orlando Vargas, who voluntarily participated with me."

■ In his first point of error, appellant complains that his right to due process of law was violated by the State's use of its peremptory challenges in a racially discriminatory manner, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). To establish a prima facie case of purposeful discrimination by the State in the selection of a jury, the defendant must show that: (1) the defendant is a member of a racial group capable of being singled out for differential treatment; (2) the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race; and (3) these facts and other relevant circumstances raise an inference that the prosecutor used that practice to exclude an

identifiable group from the jury on account of race. *Batson v. Kentucky*, 476 U.S. at 96, 106 S.Ct. at 1723.

Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for using its peremptory strikes on persons of the defendant's race. The prosecutor's explanation need not rise to the level of justifying the exercise of a challenge for cause. However, the prosecutor must articulate a neutral explanation related to the particular case to be tried. *Batson v. Kentucky*, 476 U.S. at 97–98, 106 S.Ct. at 1723–24; *Rodgers v. State*, 725 S.W.2d 477, 479 (Tex.App.—Houston [1st Dist.] 1987, pet ref'd).

In our review of the record, we will consider the evidence in the light most favorable to the trial court's rulings and determine if those rulings are supported by the record. If the record supports the findings of the trial judge, they will not be disturbed on appeal. *Keeton v. State*, 749 S.W.2d 861, 865 (Tex.Crim.App.1988).

▮ The record shows that appellant is a black man of Cuban descent. The court conducted voir dire examination of a venire of 40 persons. Four persons were excused for cause. The State and appellant used 10 peremptory strikes each. After the jury was selected, but before it was sworn, appellant moved for a mistrial:

> At this time the defense would like to move for a mistrial on the grounds that the jury panel that has been selected has only one black member on it and out of an original six that were on the venire. Now, I would like the Court to judicially take notice the defendant is a black man and I would further—I would say to the Court that I haven't struck absolutely no black persons from the venire; therefore, the Court, I think, may judicially notice or conclude that the other five have been struck by the state. Specifically, jurors No. 4, No. 16, No. 22, No. 28 and 36.

The trial court asked the State if it would like to respond. The prosecutor responded by giving racially neutral, albeit weak, reasons for his strikes against black veniremen numbers 4, 16, 22, and 28. (He point-

ed out that the State did not strike black venireman number 36, as 36 was never reached during selection.) Once the prosecutor has articulated racially neutral explanations, the other side may attempt to show that such explanations are merely pretextual. *Keeton v. State*, 749 S.W.2d at 865.

Appellant did nothing further to prove his allegations that the State exercised its peremptory challenges in a racially discriminatory manner, or that the prosecutor's neutral explanations were merely pretextual. He did not cross-examine the prosecutor, introduce any documentary evidence, or offer any testimony of his own. In addition, appellant did not attempt to compare the challenged black venirepersons with any of those venirepersons who were not challenged by the prosecution. However, in his brief on appeal, appellant has now offered, for the first time, a comparison of the white venirepersons against whom the State did not exercise a peremptory strike, with those black venirepersons struck by the State. According to appellant, although white veniremen had characteristics similar to the blacks against whom the peremptory strikes were used, the whites were not struck. No such argument was made in the trial court.

During the hearing, counsel for appellant gave no indication to the trial judge that he wanted him to consider the credibility of any neutral explanation offered by the State, based upon the manner in which similarly situated white veniremen were treated during voir dire. Although appellant now argues that the prosecutor's articulated reasons were pretextual, and the acceptance of these reasons makes a mockery of *Batson*, appellant made no attempt to show the trial court that the prosecutor's explanations were merely pretextual. *See Keeton* 749 S.W.2d at 865.

In *Tompkins v. State*, 774 S.W.2d 195, 202 n. 6A (Tex.Crim.App.1987), *aff'd*, —— U.S. ——, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989), the Texas Court of Criminal Appeals held:

> In a supplemental brief ... appellant has offered just such a comparison, inviting

this Court to employ the record of jury selection that exists in this cause to impeach or rebut testimony given by the prosecutors at the "Batson" hearing.... The point is well-taken and does cast considerable doubt upon the neutral explanations offered by counsel for the State. Had the matter been pressed by defense counsel during his cross-examination of the prosecutors, or otherwise brought before the trial judge at the "Batson" hearing, it might have materially affected the trial judge's ultimate findings of fact. However, even though the trial judge might have judicially noticed or independently recalled testimony from the jury selection process, there is nothing in the "Batson" hearing to suggest that she was requested by defense counsel to do so. In short, at the "Batson" hearing counsel for appellant gave no indication to the trial judge that he wanted her to consider the credibility of any neutral explanation offered by the State based upon the manner in which similarly-situated white veniremen were treated during voir dire.

We point out that, at a hearing conducted pursuant to Batson, the trial judge is the factfinder, and it is his responsibility to weigh the evidence and determine the credibility of the witnesses. A reviewing court should reverse his findings only when they are not supported by sufficient evidence, or as we often say, for an "abuse of discretion." Because the trial judge was not urged to make, and did not make, a finding based upon a comparison analysis in deciding the issue whether the prosecutors' neutral explanations were rebutted or impeached at the "Batson" hearing with evidence that unchallenged white veniremen also possessed the same purportedly undesirable characteristics, we do not consider this circumstance in reviewing the trial judge's findings in this cause.

■ No other facts or relevant circumstances were introduced by appellant during the "Batson" hearing from which an inference of purposeful discrimination could arise. If the defendant wanted to rebut the prosecutor's neutral explanation

based upon the manner in which similarly-situated white venirepersons were treated during voir dire, it was incumbent upon him to raise the argument in the trial court. Rebuttal evidence will not be considered for the first time on appeal. *Id.*

The dissent states that the "prosecutor's excuses for challenging the black members of the venire violated the holding of *Whitsey v. State,* No. 1121–87 (Tex.Crim.App., May 10, 1989) (not yet reported)." In *Whitsey,* however, the defendant brought to the attention of the trial court the disparate treatment of similarly situated white venirepersons. The appellate courts in *Whitsey* were not considering the defendant's rebuttal of the State's neutral explanations for the first time on appeal. Therefore, we find that *Tompkins,* not *Whitsey,* is controlling here.

Appellant's first point of error is overruled.

■ In his second point of error, appellant complains that he should be granted a new trial, because he was denied due process of law and fundamental fairness. He contends that the State relied on perjured testimony at trial. On April 7, 1988, we ordered the trial court to conduct an evidentiary hearing. This hearing was conducted on June 14, 1988.

At the evidentary hearing, appellant testified that he had been with Jiminez and Lopez at a bar on the day of his arrest. The three left the bar and walked to appellant's apartment, which he shared with Romero. At trial, however, the defense witnesses testified that the three went to the apartment of Jiminez's friend, to ask if the friend wanted to go with them to a dance. Upon their arrival, they discovered the friend no longer lived there. Instead, they found a stranger, Romero, who invited them into the apartment. The differences between appellant's testimony, at the evidentiary hearing, and the trial testimony of Lopez, Jiminez, and Romero were subtle, but significant in terms of appellant's credibility.

Appellant said that Romero walked outside the apartment, then returned and be-

gan talking with appellant. Appellant claimed that there was no cocaine in the apartment and that none of the people in the apartment that day possessed any cocaine. He testified that, as Romero stepped out of the apartment a second time, several police officers ran into the apartment after him with their weapons drawn. Appellant claimed that the officers placed each of the occupants against the wall, handcuffed them, and emptied their pockets. Appellant then contends that the officers took him into another room to ask him where the cocaine was, and that the officers struck him after he denied knowing anything about any drugs. He was then taken to the police station. Appellant testified that he had never seen DeAlejandro or Villoutreux prior to his arrest, but believed they had a grudge against him because he had previously been in the penitentiary.

Michael Grant testified that he had been employed as a confidential informant by the Southeast Tactical Response Team of the Houston Police Department. The officers involved in this case were members of that force. Grant stated that he did not know anything about the facts surrounding this case and he did not recognize appellant. However, Grant testified that it was a common and routine practice of the officers of the unit to falsify offense reports, manufacture evidence, and commit perjury, if necessary to get a conviction.

Officers DeAlejandro, Villoutreux, and William Katz also testified. At the time of the hearing, these three men were under investigation. About one month after the hearing, all three were fired from the Houston Police Department after an investigation into the illegal practices of the unit. Villoutreux testified that he had no reason to believe his testimony was not true, and that he would "stand by the testimony that I gave back then." DeAlejandro and Katz both invoked the fifth amendment right against self-incrimination to every question they were asked.

At the conclusion of the hearing, the court entered written findings of fact and concluded, as a matter of law, that there was no evidence to support the allegation that the conviction in *this* case was predicated or obtained as a result of perjured police testimony. The court's denial of a motion for new trial will not be reversed on appeal absent a showing of clear abuse of discretion. *Bolden v. State*, 634 S.W.2d 710, 711 (Tex.Crim.App. [Panel Op.] 1982).

Appellant argues that the testimony elicited at the hearing raises a substantial probability of denial of due process and fundamental fairness, and that he should be granted a new trial. We disagree. There was no evidence that either of the officers lied while under oath in *this* trial. The judge was not permitted to draw any inference from the officers' invocation of the privilege against self-incrimination. Tex.R.Crim.Evid. 513(a). Appellant had the burden to prove that the testimony was perjured. *See Jones v. State*, 711 S.W.2d 35, 36 (Tex.Crim.App.1986) (defendant has initial burden to show that there is, in fact, new evidence that is competent and material to the case). We find that the trial court did not abuse its discretion in denying appellant's motion for new trial.

Appellant's second point of error is overruled.

Affirmed.

O'CONNOR, J., dissents.

O'CONNOR, Justice, dissenting.

I respectfully dissent from the majority opinion.

## I. THE BATSON INQUIRY

The majority concedes that the prosecutor's explanations for the State's strikes were "weak." The majority, however, overrules appellant's first point of error because appellant did not "raise the *argument* in the trial court." The majority then says, "Rebuttal *evidence* will not be considered for the first time on appeal." (Emphasis added.) I do not understand. Was appellant required to articulate another objection to the prosecutor's excuses or was appellant required to introduce evidence?

If the majority means that appellant had to articulate another objection, I disagree. The record shows the State did not offer race-neutral explanations. *Batson v. Kentucky*, 476 U.S. 79, 96, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986), does not require appellant to restate the obvious to the trial court.

If the majority means that appellant had to introduce additional evidence, again I disagree. The prosecutor's excuses for challenging the black members of the venire violated the holding of *Whitsey v. State*, No. 1121–87 (Tex.Crim.App., May 10, 1989) (not yet reported).

To object to the State's use of peremptory challenges to exclude members of defendant's racial group from the petit jury, defendant must show he is a member of a cognizable racial group; and the prosecutor exercised peremptory challenges to remove members of defendant's racial group from the venire. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723. These facts, and any other relevant circumstances, raise an inference the prosecutor used the peremptory strikes to exclude members of defendant's race from the jury. *Id.*

Once a defendant makes a prima facie showing, the burden shifts to the State to offer race-neutral explanations that relate to defendant's case. *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724. Once the State comes forward with its explanations, the Supreme Court said:

> The trial court then will have the duty to determine if the defendant has established purposeful discrimination.

*Id.*

In *Tompkins v. State*, 774 S.W.2d 195 (Tex.Crim.App.1987), the Court of Criminal Appeals explained that if a defendant establishes a prima facie case of purposeful discrimination, the State's exercise of peremptory strikes violates defendant's right to equal protection of the law. *Id.* at 201. If, however, the State offers race-neutral explanations for the challenges, the State can rebut the prima facie case of purposeful discrimination. *Id.*

The question here hinges on one issue: What is a race-neutral explanation? The Supreme Court said the State may not simply deny a discriminatory motive. *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724. Nor may the State claim it struck jurors of defendant's race because they might be partial to defendant. *Id.* at 97, 106 S.Ct. at 1723; *Rodgers v. State*, 725 S.W.2d 477, 479 (Tex. App.—Houston [1st Dist.] 1987, pet. ref'd).

In *Whitsey*, the Court of Criminal Appeals held a race-neutral explanation was not enough; the explanation must be supported by the record. Slip op. at 8–9. If the record shows the State did not apply the race-neutral objection to members of the venire who did not belong to defendant's racial group, the explanation is not neutral to race. Slip op. at 13. That is, the State cannot claim an objection is race-neutral if the State selectively applied it to members of defendant's racial group.

Appellant is a black man of Cuban descent. Four of the six blacks on the venire were excused on peremptory challenges by the State. I believe *Batson* and *Whitsey* require us to review the rationale for each seemingly neutral rationale offered by the prosecutor. *Whitsey*, slip op. at 8. Although the prosecutor's explanations for his challenges are neutral on their face, if we also consider the voir dire testimony and the information on the juror forms, the explanations are not neutral.

A. *The black venire members who were struck.*

Here are the prosecutor's explanations for striking three of the blacks on the panel:

#### Ms. Clark

The prosecutor said he struck Ms. Clark because she is a legal assistant. In his opinion, members of the legal community are the "toughest." Presumably, he meant they were the toughest on the State, although he did not explain his remark.

The prosecutor did not have the same objection to whites who had ties with the legal profession. The prosecutor did not

strike three white venire members who seemed to fall into the category of persons in the legal community: a lawyer, a paralegal, and the wife of a lawyer.

### Ms. Porter and Mr. Martin

The prosecutor said he struck Ms. Porter because she had a family member who had been convicted of public intoxication; and he struck Mr. Martin because he had been arrested for DWI 10 years before.

The prosecutor did not have the same objections to whites with criminal convictions. One white venire member had been convicted of a DWI five years before. One had been convicted of a weapons charge, and another had been convicted of possession of marijuana.

### B. *The Whitsey holding.*

The *Whitsey* court said the State's disparate exercise of preferential strikes against persons with similar characteristics but of different races, is impermissible. The prosecutor's peremptory challenges exercised against certain black venire members were based on reasons equally applicable to white venire members who were not challenged by the prosecutor.

As the court said in *Whitsey,* the exclusion of even one member of appellant's race from the jury panel for racial reasons invalidates the entire jury selection process. Slip op. at 15. Having been denied due process in the selection of the jury, appellant is, therefore, entitled to a new trial.

### C. *Appellant's burden.*

The majority says appellant did not prove his allegations that the State exercised its challenges in a discriminatory manner because he did not cross-examine the prosecutor, introduce documentary evidence, offer any testimony, or attempt to compare the challenged black venire members with any of those venire members who were not challenged.

I do not see how the cross-examination of the prosecutor would have helped. The prosecutor was not likely to be so overwhelmed by the skill of appellant's cross-examination to confess to racial bias.

I do not know what documentary evidence or testimony appellant could have offered. The entire inquiry was to the prosecutor's state of mind.

I do not see how the appellant's articulation of objections to the prosecutor's excuses could add anything. The judge was present in the courtroom and was a witness to the voir dire. He heard the examination of the venire members, he saw which venire members were excluded, and he heard the prosecutor's explanations.

The majority relies on footnote 6A in *Tompkins* as authority for overruling appellant's point of error. In the text to that footnote, the Court of Criminal Appeals noted that the defendant did not compare the blacks who were struck with the whites on the panel. In footnote 6A, the court said *Batson* does not require the judge to consider the possibility that the State's explanations are not neutral to race unless the defendant asks the court to do so. The Court of Criminal Appeals does not place any burden on the trial court, as the fact finder, to evaluate the State's explanations in light of the voir dire and the State's strikes.

I respectfully suggest that, once a defendant objects to the jury panel and raises a prima facie case of discrimination, *Batson* requires the trial court to evaluate the State's strikes in light of the information elicited during voir dire. The trial judge cannot merely be present in the courtroom. The trial judge is charged with all the information in this record.

I would hold that appellant made a prima facie showing of racial discrimination in the striking of black venire members. Further, I would hold the State did not rebut that inference because its explanations were not, on this record, race-neutral.

## II. PERJURED TESTIMONY

In his second point of error, appellant claims he was convicted on perjured testimony. Upon orders of this Court, the trial court held an evidentiary hearing to take evidence on this issue.

The standard we should apply in reviewing the trial court's ruling at the post-appeal hearing is the same standard we apply to the ruling on a motion for new trial. Rule 30, Tex.R.App.P., states that the trial court should grant a defendant a new trial:

(5) Where ... any evidence tending to establish the innocence of the accused has been intentionally destroyed or withheld preventing its production at trial;

(6) Where new evidence favorable to the accused has been discovered since trial; ...

The trial court's ruling on the motion for new trial based on newly discovered evidence is within the court's sound discretion. We will not disturb the court's ruling unless the trial court abused its discretion. *Bolden v. State,* 634 S.W.2d 710, 711 (Tex. Crim.App. [Panel Op.] 1982).

To show that the court abused its discretion, the record must show: (1) that there is new evidence, both competent and material, which was not known to the movant at trial; (2) that movant's failure to discover it was not due to his lack of diligence. Once a defendant establishes these two factors, he has made a prima facie case for a new trial. *Jones v. State,* 711 S.W.2d 35, 36 (Tex.Crim.App.1986). The burden then shifts to the State to show that a different result would probably not be reached if the new testimony is produced upon another trial. *Id.*

Appellant, who did not testify at the trial, testified at the evidentiary hearing. He testified he was in his apartment, which he shared with another person, when the police arrested him. He said officers DeAlejandro and Villoutreux handcuffed him and beat him to get him to tell them where the cocaine was. Appellant said the officers emptied his pockets and searched the apartment but did not find anything. The next day, when he was being arraigned, he found out he had been charged with possession of one gram of cocaine.

Appellant also called Michael Grant, a confidential informant, and the three officers who arrested him to testify at the hearing. Grant was an informant for the Southeast Tactical Response Unit for about two and a half years, which included the time of appellant's arrest. Grant testified he participated in about two hundred "busts" with members of the Southeast Unit, including officers DeAlejandro, Villoutreux, and Katz. Grant testified it was routine practice among the officers of the unit, including DeAlejandro and Villoutreux, to falsify offense reports, manufacture evidence, and commit perjury. Grant testified the officers routinely arrested all persons at the scene regardless of their involvement. Grant testified the officers always found a way to justify the arrest. He said 95% of the arrest reports were falsified.

Grant testified that most of the officers in the Tactical Unit could not make buys. The reason was, they were not "cool" enough; they looked too much like police officers. Grant said DeAlejandro and Villoutreux never bought dope. Grant said a dope dealer would have to be stupid to sell dope to DeAlejandro or Villoutreux, because they look like cops. Grant said a blind person could tell the two were cops.

Officer Villoutreux testified he "vaguely" recalled his testimony. He claimed no independent recollection of events other than his review of the trial transcript. Officers DeAlejandro and Katz invoked the fifth amendment.

The majority says that there was no evidence that either officer lied under oath in *this* trial. I disagree. The officers falsified evidence in 95% of their cases to obtain convictions, neither officer ever made buys of drugs, and the officers always found a way to justify an arrest.

The majority cites Tex.R.Crim.Evid. 513(a), to support its statement that the trial court was not permitted to draw any inference from the officers' invocation of the privilege against self-incrimination. Again I disagree. The majority cites no case that supports the use of rule 513(a). When a defendant's due process rights are in conflict with the rights of the testifying officers to invoke the fifth amendment, I believe the trial court should order a new trial. In a clash between rule 513(a) and a

defendant's constitutionally protected right to a fair trial, I think rule 513(a) must yield.

I believe the testimony presented by appellant established a prima facie case for a new trial. The State did not meet its burden to show a different result would not have been reached on retrial. *Jones,* 711 S.W.2d at 36; *Henson v. State,* 150 Tex. Crim. 344, 200 S.W.2d 1007, 1014 (1947). We must resolve any doubts in this case as to whether the new evidence would produce a different result in favor of appellant. *Henson,* 200 S.W.2d at 1014; *Simon v. State,* 630 S.W.2d 681, 686 (Tex.App.— Houston [1st Dist.] 1981, no pet.).

This case, as the recent case of *Ex parte Adams,* 768 S.W.2d 281, 289 (Tex.Crim. App.1989), involves the corruption of the truth-seeking function of the trial process. We should reverse for a new trial.